**Michael BOMBRYS, Plaintiff,**

v.

**CITY OF TOLEDO, Defendant.**

**No. 3:92CV7592.**

United States District Court,
N.D. Ohio, W.D.

June 4, 1993.

1212

Paul T. Belazis, Nathan & Roberts, Toledo, OH, for plaintiff.

Robert G. Young, City of Toledo, Department of Law, Toledo, OH, for defendant.

## OPINION AND ORDER

DON J. YOUNG, Senior District Judge.

This Opinion and Order will serve as the Court's Findings of Fact and Conclusions of Law.

This Court has accepted jurisdiction over this matter pursuant to the pending consent decree in *Gonzales v. Felker*, C72–263, and pursuant to 28 U.S.C. § 1331.

### I.

On October 20, 1992, Michael Bombrys filed with this Court a Complaint For Injunctive Relief. In his complaint, Mr. Bombrys alleges that he was disqualified as a candidate for the position of police officer because he was and is an insulin-dependent diabetic. Mr. Bombrys claimed that such disqualification violates the Rehabilitation Act of 1973, the recently enacted Americans With Disabilities Act, and Ohio Revised Code § 4112.02.

The Defendant, the City of Toledo, answered the Plaintiff's complaint on November 3, 1992. In its answer, the City of Toledo (hereinafter "the City") admits that this Court has jurisdiction pursuant to the consent decree in *Gonzales v. Felker*, C72–263, but otherwise denies the substantive allegations contained in the Plaintiff's complaint. The City asserts the affirmative defense that the Plaintiff has failed to state a claim upon which relief could be granted.

This Court granted the Plaintiff's request for a temporary restraining order preventing the City from dismissing Mr. Bombrys from the police class. This Court reserved ruling on the Plaintiff's requests for preliminary and permanent injunctions pending a hearing and the submission of deposition testimony by expert witnesses.

A hearing was held on November 24, 1992. The Plaintiff, Michael Bombrys, testified on his own behalf, and he called Officers George Gerkins, Kathy Cherry, and Tommy Lyles to testify in support of his case. The Plaintiff also called retired Deputy Chief Ronald Jackson to testify. In support of its position, the Defendant called Deputy Chief James Weigand. Also presented as evidence in this

case are numerous depositions by expert witnesses. The Plaintiff submitted the deposition testimony of Dr. Stewart Hamilton, Dr. Majabeen Islam–Husain, Dr. Basil Akpunonu, and Sergeant Ronald James of the City of Cleveland Police Division medical unit. The Defendant submitted the deposition testimony of Dr. John Webster and Dr. Michael Riethmiller. In addition to the testimonial evidence, this Court received a great deal of documentary evidence.

Each party submitted a post hearing brief, and the American Diabetes Association filed an Amicus Brief in support of the Plaintiff's position.

On December 28, 1992, the Plaintiff moved to amend his complaint to include claims that the City's action violated his Fourteenth Amendment Due Process rights. The Plaintiff alleged no new facts, merely requested permission to add a legal theory to his complaint. The Defendant objected to the proposed amendment, and this Court reserved making its ruling.

On April 12, 1993, the Defendant filed a Motion To Dissolve Restraining Order. In its accompanying memorandum, the City alleged that, as a result of his insulin-dependent diabetes, the Plaintiff presented a danger to himself and others. The City cited to a specific incident that occurred on April 11, 1993 in which the Plaintiff suffered an alleged insulin reaction while he was on duty. According to the incident report that was attached to the April 12, 1993 motion, Mr. Bombrys became confused and non-responsive. After Mr. Bombrys had been treated by the paramedics, he became less combative and more coherent, and he was transported to St. Vincent's Hospital. The Plaintiff opposes the City's Motion, arguing that, even if the Plaintiff himself is not qualified to be a police officer, the City's blanket exclusion of insulin-dependent diabetics must end.

On May 7, 1993, the Plaintiff filed a Supplemental Response To Defendant's Motion To Dissolve Restraining Order. Accompanying his motion, the Plaintiff submits an incident report of May 6, 1993 in which the reporting officer documents Officer Bombrys's performance in apprehending a fleeing suspect. According to the incident report, Officer Bombrys chased a suspected thief through hazardous terrain, off a garage roof, and to a point where a violent confrontation occurred. The suspect stabbed Officer Bombrys with a screwdriver, but Officer Bombrys was not injured because he was wearing a protective vest. The suspect was eventually arrested.

## II.

The facts in this case are largely undisputed. Mr. Bombrys is an insulin-dependent diabetic Toledo resident who desired to become a police officer. He was notified, on September 17, 1992, that he had been selected to begin training in the 1992 police officer trainee class. As part of the training and employment process, Mr. Bombrys underwent psychological and physical examinations. He passed the psychological examination, but when he informed the examining physician of his diabetes, he was automatically rejected. Mr. Bombrys passed the physical ·examination in all other respects.

In an attempt to persuade the City of Toledo to accept him as a police officer candidate, Mr. Bombrys appealed the City's rejection of him. He provided the City's chief physician with medical records demonstrating that his diabetes was well-controlled. The chief physician informed Mr. Bombrys that the Civil Service Commission had instructed him to reject any applicants with insulin-dependent diabetes. Having exhausted all available appellate and administrative procedures with the City, Mr. Bombrys initiated this action. Both Mr. Bombrys and the City agree that Mr. Bombrys was rejected from the police trainee program solely because of his insulin-dependent diabetes.

The majority of the testimony, both from the witnesses at the hearing and from the deposed experts, revolves around the medical and safety implications of diabetic individuals as police officers. Diabetes mellitus [1] is a

---

1. There are several types of diabetes, namely, diabetes mellitus (types I and II), diabetes insipidus, gestational diabetes, etc. Since Mr. Bombrys is an insulin-dependent diabetic, i.e., he has been diagnosed as having type I diabetes mellitus, the terms "diabetic" and "diabetes," as they

medical condition in which the beta cells of the pancreas fail to secrete sufficient insulin. Insulin is a hormone that serves to "drive" sugar from the bloodstream into the cells of the body where it is metabolized. Without insulin to cause sugar to cross the cell membrane, the sugar stays in the bloodstream where the kidneys attempt to eliminate it through increased production of urine. If this increased urine production is not slowed by an insulin injection, the diabetic person may suffer blurred vision, lose consciousness, or even die. Insulin injections carry some danger of their own, however. Too much insulin in the bloodstream causes too much sugar to cross the cell membranes into the cells, resulting in abnormally low blood sugar levels. Persons with blood sugar levels that are extremely low may experience confusion, slurred speech, convulsions, or coma. While blood sugar levels are dropping, many diabetic persons experience extreme hunger, sweating, or rapid heartbeats. These warning signs signal that the diabetic person must ingest some food so that blood sugar levels will rise. To prevent hazardously low blood sugar levels, many diabetic individuals carry glucose tablets, food, or candy with them that they can ingest quickly and at any time.

While elevated blood sugar levels are of some concern due to their long-term side effects, the real danger to diabetic individuals is low blood sugar levels. The hazardous side effects associated with low blood sugar levels occur more quickly, more often, and with more suddenness than do the effects of high blood sugar levels. A diabetic individual with low blood sugar levels often becomes confused and may not be aware of what is happening, making self-correction of the low sugar levels impossible. To avoid the hazardous effects of low blood sugar levels, some diabetic individuals keep their sugar levels higher than is desirable.

There is no doubt that a diabetic person must balance food intake, exercise, and insulin injections to keep blood sugar levels within a certain range to avoid the dangers described above. The evidence before this Court suggests that ideal blood sugar levels are somewhere between 70 mg/dl and 120

mg/dl. Diabetic individuals are often not able to keep their blood sugar levels within such a narrow range, however. Some individuals allow their blood sugar levels to go as high as 400 mg/dl before injecting insulin.

There are several different types of insulin, and each type accomplishes a different task. Humulin N is a longer-acting insulin and it is usually injected once or twice per day—in the morning and/or evening. Humulin R is shorter acting, more quick to have an effect, and is injected at any time that blood sugar levels are too high and must be brought down. The Humulin N is expected to remain in the diabetic's system for the better part of the day. Many diabetic individuals carry monitoring equipment and Humulin R with them. If the monitoring equipment indicates that blood sugar levels are too high, the individual injects the appropriate amount of Humulin R, which will then lower the blood sugar levels. There was testimony suggesting that the injection of Humulin R could be accomplished almost anywhere, even in a moving vehicle, but that such circumstances would be somewhat less than ideal.

Also relevant to this case are the duties of police officers. Both the Plaintiff and the Defendant introduced the 1990 Police Officer Medical Standards Evaluation Process as an exhibit. (Plaintiff's exhibit 1 and Defendant's Exhibit A) In this lengthy and exhaustive report are the results of a police officer job analysis that was conducted in 1989. That job analysis reveals that police officers must be able to perform duties as varied as arresting persons to parade detail. Officers are expected to perform these duties in all types of working conditions and while under the worst circumstances. The job analysis contains seventy-some pages of physical characteristics that police officers must have, among them: static, explosive, and dynamic strength; stamina; mobility; and dexterity. Police officers must also be able to think clearly and quickly under the most trying of situations.

Patrol officers spend a great deal of time driving around Toledo where they are on the lookout for crimes in progress and are avail-

are used in this opinion, refer to type I diabetes mellitus.

able to respond to citizen complaints. Officers can be ordered to respond to emergencies, which can result in the interruption of normal meal times and the postponement of scheduled off-duty times. The testimony established that officers have been required to work up to twelve straight hours only three times during the past twenty-five years. During the same twenty-five year period, an officer has never been required to work more than twelve straight hours.

Officers keep fairly regular shifts during their careers. Shift changes are usually required once per year, but in some cases, may be required every six months. Some of the medical experts held the opinion that such shift changes would be disruptive to a diabetic person's blood sugar maintenance routine, while others thought a shift change would have little effect.

The City of Toledo currently has insulin-dependent individuals serving as police officers. These diabetic officers joined the force prior to the 1985 implementation of the City's blanket exclusion of insulin-dependent diabetics. Officer Kathy Cherry testified that she has been an insulin-dependent diabetic for nine years, and that her diabetic status has not had an effect on her abilities to perform her duties as a police officer. Similarly, Officer Tommy Lyles testified that he has been insulin dependent for many years. Officer Lyles admitted that his diabetic status had caused him to call in sick on several occasions. There was no testimony to suggest that Officer Lyles's diabetes had interfered with any of his duties while he was on the job, however.

The Cities of Cleveland, Columbus, Dayton, and Youngstown do not categorically exclude insulin diabetic individuals from their police forces. The Cities of Cleveland and Columbus evaluate each individual's medical condition on a case-by-case basis. Specifically, the City of Cleveland sends each insulin-dependent candidate to a specialist who performs an evaluation to determine whether that candidate can fulfill the job duties of a police officer. The City of Dayton will consider insulin-dependent applicants who have their diabetes well-controlled. The City of Youngstown mandates only that all applicants meet the physical requirements necessary to perform the duties of a police officer. In contrast, the Federal Bureau of Investigation maintains a blanket exclusion of all insulin-dependent diabetics who desire to become special agents.

Retired Deputy Chief Ronald Jackson testified that, once an officer is on the police force, that officer's health is never checked unless there is a specific incident necessitating such a check. Officers have been known to develop epilepsy, obesity, asthma, and other health conditions while serving on the police force. Unless there is a specific incident requiring dismissal, these officers continue to be employed by the City of Toledo.

### III.

The issue before this Court is whether the City of Toledo may permissibly maintain its blanket exclusion of insulin-dependent diabetics from the police force. Also before this Court is the question of whether Mr. Bombrys himself should remain on the police force.

There are several statutes controlling the issue of disabled persons and blanket exclusions. The ones of critical importance here are the Rehabilitation Act of 1973, codified at 29 U.S.C. §§ 791 *et seq.*, and the Americans With Disabilities Act, codified at 42 U.S.C. §§ 12101 *et seq.* Among other things, these two acts govern the relationship between employers and individuals with disabilities.

Section 504 of the Rehabilitation Act of 1973 provides:

> No otherwise qualified individual with handicaps in the United States, as defined in section 706(8) of this title, shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

29 U.S.C. § 794(a). Under the Rehabilitation Act of 1973, an individual must satisfy four requirements before prevailing in a job discrimination suit. A plaintiff must show: (1) That the medical condition in question is a handicap as defined by the Act; (2) That he or she is otherwise qualified for the job; (3)

That the program or activity in question receives federal assistance; and (4) That he or she was not hired because of the handicap. *Doherty v. Southern College of Optometry,* 862 F.2d 570, 573 (6th Cir.1988) *cert. denied* 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989). The term "otherwise qualified" is a term of art that has been construed to encompass a two-part analysis of the job and the individual involved. The appropriate analysis is whether the handicapped individual, with reasonable accommodation, is able to perform the essential functions of the job despite the disability. *Arneson v. Sullivan,* 946 F.2d 90, 91 (8th Cir.1991) (citing *Arneson v. Heckler,* 879 F.2d 393, 396 (8th Cir.1989)).

■ Once a plaintiff meets these four requirements, the burden then shifts to the defendant to show that it is unable to reasonably accommodate the disabled plaintiff. *Prewitt v. United States Postal Service,* 662 F.2d 292 (5th Cir.1981). Accommodation is unreasonable if it requires modification of the essential nature of the program, or if accommodation would place an undue burden, such as cost, upon the defendant. *Southeastern Community College v. Davis,* 442 U.S. 397, 410, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979). Even where reasonable accommodation is possible, if the disabled plaintiff cannot perform the essential functions of a job without endangering those around him or her, the employer is not required to hire him or her. *School Board of Nassau County v. Arline,* 480 U.S. 273, 287 n. 16, 107 S.Ct. 1123, 1131 n. 16, 94 L.Ed.2d 307 (1987). This potential for injury must not be based on stereotypes or suspicions, however, but must be verifiable. *Id.* at 284–85, 107 S.Ct. at 1129–30.

The General Rule of The Americans with Disabilities Act provides:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). The burdens on a plaintiff proceeding under The Americans With Disabilities Act are similar to those borne by a plaintiff proceeding under the Rehabilitation Act of 1973.

■ A plaintiff must show that he or she can perform the essential functions of a job. A job's essential functions are often defined by an employer and can be found in a job description. Congress has defined essential functions as "the fundamental job duties of the employment position the individual with the disability holds or desires." 29 C.F.R. § 1630.2(n) The Interpretive Guidance section associated with the Americans With Disabilities Act suggests that disabled individuals must be individually assessed for each job for which they apply. Interpretive Guidance to 28 C.F.R., Part 35, Subpart A, § 35.104. Courts have interpreted the Americans With Disabilities Act to require a case-by-case analysis of disabled persons and the jobs they desire to obtain. *Anderson v. Little League Baseball, Inc.,* 794 F.Supp. 342, 345 (D.Ariz.1992). Employers need not employ a disabled individual if that individual poses a direct threat to the health or safety of others. 42 U.S.C. § 12182(b)(3). A direct threat is a "significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices or procedures or by the provision of auxiliary aids or services." *Id.*

■ Before declining to hire a disabled individual due to that individual's direct threat to others, the employer must determine, on an individualized basis, the: (1) nature, duration, and severity of the risk; (2) probability that the potential injury will actually occur; and (3) possibility that reasonable modifications of policies, practices, or procedures will mitigate the risk. 28 C.F.R. § 36.-208(c). It is acceptable for an employer to conduct pre-employment inquiries into the abilities of disabled persons to perform job-related functions. 29 C.F.R. § 1630.14(a) Employers may ask the applicant to demonstrate how he or she would perform the job, with or without accommodation. *Id.*

■ When an otherwise qualified individual has been hired or is applying to be hired and requests an accommodation from the employer, the employer must:

(1) analyze the particular job involved and determine its purpose and essential functions;

(2) Consult with the individual with a disability to ascertain the precise job-related limitations imposed by the individual's disability and how those limitations can be overcome with a reasonable accommodation;

(3) In consultation with the individual to be accommodated, identify potential accommodations and assess the effectiveness each would have in enabling the individual to perform the essential functions of the position; and

(4) Consider the preference of the individual to be accommodated and select and implement the accommodation that is most appropriate for both the employee and the employer.

Appendix to part 1630—Interpretive Guidance on Title I of the Americans With Disabilities Act, Section 1630.9. As with the Rehabilitation Act of 1973, the employer is not required to make an accommodation that changes the nature of the job or is excessively costly. The employer is also not obligated to find or create a new position if, after accommodation, the plaintiff cannot perform the essential functions of the position. *School Board of Nassau County v. Arline,* 480 U.S. 273, 289 n. 19, 107 S.Ct. 1123, 1131 n. 19, 94 L.Ed.2d 307 (1987)[2]. If the employer alleges that any accommodation is unreasonable, it is the burden of that employer to prove such an allegation.

 Presumptions that irrebuttably determine that an individual is unqualified for a particular job are violative of the Due Process Clause of the Fourteenth Amendment of the United States Constitution. *Cleveland Board of Education v. La Fleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974). All persons must be given an opportunity to demonstrate their fitness for a given job.

 Ohio has enacted legislation designed to prohibit discrimination on the basis of handicap. Ohio Civil Rights Act, R.C.

§ 4112.01 *et seq.* To prevail under the Ohio statute, a plaintiff must show that: (1) he or she is handicapped; (2) the action taken by an employer was due to the handicap; and (3) he or she can substantially perform the essential functions of the job safely. *Hazlett v. Martin Chevrolet, Inc.,* 25 Ohio St.3d 279, 281, 496 N.E.2d 478, 480 (1986). If a plaintiff is successful at proving all three of the above elements, he or she is entitled to civil damages and injunctive relief.

### IV.

The Plaintiff in this case, Michael Bombrys has requested that this Court: (1) issue preliminary and permanent injunctive relief to prevent the City of Toledo from dismissing him from the police officer trainee class; and (2) enjoin the City of Toledo from imposing its blanket exclusion of insulin-dependent diabetic individuals from becoming Toledo police officers. Mr. Bombrys alleges that he is entitled to such relief under the Rehabilitation Act of 1973, the Americans With Disabilities Act, the Due Process Clause of the Fourteenth Amendment, and the Ohio Civil Rights Act.

As stated above, under the Rehabilitation Act of 1973, Mr. Bombrys must show: (1) That his medical condition is a handicap as defined by the Act; (2) That he is otherwise qualified for the job; (3) That the City of Toledo's Police Force receives federal assistance; and (4) That he was rejected from the police officer trainee class because of his handicap. The City of Toledo and Mr. Bombrys have agreed that diabetes is a handicap, that the City receives federal assistance, and that Mr. Bombrys was not accepted into the class due to his diabetes. Accordingly, the only issue left to be decided by this Court, under the Rehabilitation Act of 1973, the Americans With Disabilities Act, and the Ohio Civil Rights Act, is whether Mr. Bombrys is otherwise qualified to be a police officer. In other words, is Mr. Bombrys able, with reasonable accommodation, to perform the essential functions of a police officer?

---

**2.** While the *Arline* case was decided under the Rehabilitation Act of 1973, it is also used to interpret the Americans With Disabilities Act.

*See* 28 C.F.R. § 36.104, Appendix B to Part 36, Published July 26, 1991.

Both the City of Toledo and Mr. Bombrys presented the 1990 Police Officer Medical Standards Evaluation Process as an exhibit in this case. (See Plaintiff's Exhibit 1, Defendant's Exhibit A) Both parties presented it as evidence of the duties and the job description of a police officer in the City of Toledo. This Court finds that it contains a description of the essential functions of a police officer, and it will be used as the "essential functions" measuring device required by the Americans With Disabilities Act. 29 C.F.R. § 1630.2(m). There was no testimony to suggest that Mr. Bombrys is unable to perform any of the specific tasks within this report. Rather, the testimony surrounded Mr. Bombrys's diabetic condition and whether that condition could, at any given time, prevent him from doing any of the tasks.

The City alleges that Mr. Bombrys's diabetes could cause him to become confused, combative, or even unconscious while he is on duty. If any of these events were to occur, Mr. Bombrys would endanger not only himself, but those around him. The City has the right, under the Rehabilitation Act of 1973, to exclude all handicapped individuals from specific jobs if such an exclusion is related to business necessity and safe performance. 29 C.F.R. § 32.14(b). Accordingly, the City argues, Mr. Bombrys, like all insulin-dependent diabetics, is not otherwise qualified to be a police officer.

Mr. Bombrys responds that he, with reasonable accommodation, is otherwise qualified, and can safely perform the duties of a police officer. The accommodations Mr. Bombrys requires are blood-sugar monitoring equipment and, if mandated by the blood monitoring results, either food/glucose or insulin. The blood sugar instrument is about five inches long and two to three inches deep. Deposition, Majabeen Islam–Husain, at 32. Mr. Bombrys testified that he can monitor his blood sugar levels at almost any time or location, and that the entire process takes only a few minutes. The medical experts testified that the blood monitoring can be performed while Mr. Bombrys is in a moving patrol car, if necessary. Deposition, Stewart M. Hamilton, at 17. Likewise, an insulin injection can be performed while Mr. Bombrys is clothed and in a moving patrol car, but this situation is less than ideal. *Id.* at 18.

Mr. Bombrys requests that he be permitted to carry food either on his person or in his patrol car, or be permitted to carry glucose gel or tablets on his person. In the event that his blood sugar drops to a level where dangerous side effects are possible, he could then ingest the food or glucose and prevent a low-sugar reaction. Mr. Bombrys also requests permission to carry a pen-like device containing an insulin injection kit on his person should his blood sugar levels indicate that insulin is necessary. Mr. Bombrys further argues that such accommodations would be neither costly to the City nor would they alter the basic functions of the job of police officer.

There currently is no policy in place by the City of Toledo that prevents police officers from carrying food in their patrol cars or prevents them from carrying small items, such as glucose gel, on their persons. It appears, therefore, that allowing Mr. Bombrys to do these things would not be an accommodation in the sense that, in accommodating Mr. Bombrys, the City would not have to change some sort of policy or routine.

The City of Toledo had the burden of proving that the accommodations requested by Mr. Bombrys were either too expensive or would change the fundamental nature of the job. The City did not prove either of these things. Accordingly, this Court finds that the accommodations requested by Mr. Bombrys are reasonable as contemplated by the Rehabilitation Act of 1973 and the Americans With Disabilities Act.

■ The evidence before this Court suggests that the City is most concerned with the potential for sudden drops in the blood sugar levels of insulin-dependent diabetics such as Mr. Bombrys. This Court does not intend to belittle the very real concerns of the City of Toledo. Were Mr. Bombrys in an emergency situation, he may not have the time to monitor his blood sugar. If he were to experience a drop in his blood sugar level, he may not have the opportunity to ingest food or glucose. This Court recognizes that, if Mr. Bombrys were to become incapacitated

while involved in an emergency situation, the consequences to him and to those around him could be tragic. However, this Court also recognizes that officers become incapacitated for reasons other than insulin-dependent diabetes. There are police officers currently on the force who are overweight and run the risk of heart attack. Even young presumably healthy persons have been known to have sudden and unexpected strokes, embolisms, or seizures. Asthmatics have been known to have such severe attacks that they lose consciousness or even die. There is simply no viable or fair way to restrict the police force to individuals who will never have a catastrophic health incident while on duty. The best that the City of Toledo can do is evaluate each police officer candidate on a case-by-case basis and determine what risks that individual presents to him/herself and the public. An individual's medical history and record of compliance with physician's recommendations would seem to be an ideal place to begin such an evaluation. In short, before the City may determine that an individual poses a threat to the health or safety of others, it must develop and apply an evaluation process that will comply with the three mandates of the Americans With Disabilities Act. The City must ascertain:

(1) the nature, duration, and severity of the risk;

(2) the probability that the potential injury will actually occur; and

(3) the possibility that reasonable modifications of policies, practices, or procedures will mitigate the risk.

28 C.F.R. § 36.208(c). An individualized assessment is absolutely necessary if persons with disabilities are to be protected from unfair and inaccurate stereotypes and prejudices.

At the same time that it excludes insulin-dependent diabetics, the City seems willing to permit persons with other potentially disabling conditions to serve as police officers, i.e., the City of Toledo does not have a blanket policy preventing epileptics from serving as police officers[3]. Asthmatics are also permitted to serve on the police force[4]. The City does not relieve from duty those officers who develop insulin-dependent diabetes while serving on the force. At the very best, the City's policies in these respects seem inconsistent with a blanket policy that excludes all applicants with insulin-dependent diabetes. At worst, the City's blanket exclusion is impermissibly based upon generalizations and stereotypes. The testimony of Officers Kathy Cherry and Tommy Lyles revealed that their insulin-dependent diabetic conditions did not interfere with their on-the-job-performances[5]. Officer Cherry testified that, as a member of the City's critical incident (hostage) negotiating team, her hours can be irregular and long. She has never had an occasion when she was unable to eat, monitor her blood sugar, or inject insulin if it became necessary. She has even injected the insulin while in her patrol car.

The City of Toledo argues that its blanket exclusion is supported by health and safety concerns, citing *Davis v. Meese*, 692 F.Supp. 505 (E.D.Pa.1988) as support for its contention. *Davis* involves the F.B.I.'s exclusion of all insulin-dependent diabetics from the position of special agent. The *Davis* court determined that the blanket exclusion was justified. This Court considered the *Davis* decision carefully and determined that it is distinguishable from the case *sub judice* in several respects. Perhaps the primary distinction is that the *Davis* decision was rendered before the enactment of the Americans With Disabilities Act. The Americans With Disabilities Act makes it clear that blanket exclu-

---

**3.** Neither party presented evidence showing whether there are currently any persons with epilepsy serving on the Toledo Police Force.

**4.** Again, there was no direct testimony to show that the police force currently employs individuals with asthma. However, retired Deputy Chief Ronald Jackson testified that he has known asthmatics to wear inhalers on their belts while they were on duty. This Court concludes that the City

has employed asthmatics, if not at the present, in the past.

**5.** Officer Tommy Lyles admitted, however, that his failure always to control his blood sugar levels led to his absence from work on several occasions. There was no testimony suggesting that his insulin-dependent diabetes had ever caused Officer Lyles to perform less than adequately while he was on the job.

sions are to be given the utmost scrutiny, and are, as a general rule, to be discouraged. This Court also finds many distinctions between the duties and working conditions of Toledo police officers and special agents for the F.B.I. F.B.I. agents are involved in overseas missions and can be involved "in night and day surveillances of high speed moving vehicles whose destinations are unknown" *Id.* at 512. There was no evidence to suggest that Toledo Police Officers are expected to perform like duties. Finally, as support for its holding, the *Davis* court cited, among other things, the Department of Transportation's motor carrier safety regulations which prohibited insulin-dependent diabetics from operating over-the-road trucks in interstate commerce. The Department of Transportation is revising its policy, however, to allow certain insulin-dependent diabetics to drive in interstate commerce. This Court suspects that, in light of the Americans With Disabilities Act, the F.B.I. may also soon revise its policy concerning special agents and insulin-dependent diabetics. Accordingly, this Court cannot give controlling weight to the *Davis v. Meese*, 692 F.Supp. 505 (E.D.Pa.1988) decision.

Mr. Bombrys testified that he injects nine units of Humulin N (long acting) each morning, followed by additional units of humulin R (faster acting) during the day if his blood sugar levels warrant it. He does not inject additional fast-acting insulin every day, only when his blood sugar levels require it. The medical testimony revealed that nine units of humulin N is an extremely low dosage of insulin. By way of comparison, Officer Kathy Cherry currently injects 40–45 units of long-acting insulin every morning in addition to an injection of faster-acting insulin just before meals. Mr. Bombrys also testified that when his blood sugar levels are low and he is feeling symptoms of hunger and sweating, he eats food, juice, or a glucose tablet, and the symptoms will abate within thirty seconds to one and one-half minutes. Mr.

Bombrys exercises vigorously every day, sometimes skipping meals in favor of an exercise routine. Even when he skips a meal, his blood sugar levels do not become dangerously low. In light of all of these factors, the incident of April 11, 1993 is troubling for this Court. On April 11, 1993, while he was on duty, Mr. Bombrys suffered what appeared to be an insulin reaction or hypoglycemic episode. He became confused and combative, was eventually administered an I.V. solution, and transported to the hospital. This incident raises questions as to Mr. Bombrys's ability to anticipate and react to dangerously low blood sugar levels. Mr. Bombrys has provided this Court with no explanation for this episode. By way of contrast is the incident of May 6, 1993 in which Mr. Bombrys engaged in a foot chase with a suspected thief and was assaulted with a twelve inch screwdriver during the subsequent struggle. Mr. Bombrys escaped injury because he was wearing a protective vest. Throughout this incident, Mr. Bombrys did not suffer any ill consequences from his insulin-dependent diabetes. These two incidents present this Court with two rather extreme pictures of Mr. Bombrys. By the terms of the restraining order issued by this Court, the City was to allow Mr. Bombrys to enter and complete the police officer training academy. This he has done. The restraining order is now dissolved. With no motion before it, this Court is without jurisdiction to restrain the City from relieving Mr. Bombrys from probationary police officer duty at this point. The City has the means and Civil Service Rule 70.05 [6] at its disposal should it undertake an investigation and determine that Mr. Bombrys is unfit to serve as a police officer. What this Court would not condone is a summary dismissal that contravenes this Opinion and Order or the Rehabilitation Act of 1973 and the Americans With Disabilities Act. Since Mr. Bombrys has completed the police officer training course, this Court's

---

6. Civil Service Rule 70.05 states, in pertinent part, that: The Commission or Appointing Authority may require medical and/or psychological examinations of an employee, class of employees or prospective employees for the purpose of determining fitness for the position held or to be held.... Employees who either refuse to submit to such medical and/or psychological examinations when so ordered, or found to be unfit for the duties of their positions after such psychological or medical examinations are subject to be suspended, transferred, demoted or dismissed as the facts may warrant after charges have been preferred and hearings held.

preliminary injunction and restraining order no longer have any effect. Accordingly, the City's motion to dissolve the restraining order is moot.

Finally, blanket exclusions are inconsistent with the ideals of the Due Process Clause of the Fourteenth Amendment. Mr. Bombrys has the right to be evaluated on his own merits. This Court cannot condone his automatic disqualification because he is a one of a particular class of individuals.

Therefore, for the reasons stated herein, good cause appearing,

This Court Finds that the City of Toledo's blanket disqualification of individuals with insulin-dependent diabetes as candidates for police officer violates the Rehabilitation Act of 1973, and this Court

Further Finds that the City of Toledo's blanket disqualification of individuals with insulin-dependent diabetes as candidates for police officer violates the Americans With Disabilities Act, and this Court

Further Finds that the City of Toledo's blanket disqualification of individuals with insulin-dependent diabetes as candidates for police officer violates the Fourteenth Amendment of the United States Constitution, and this Court

Further Finds that the City of Toledo's blanket disqualification of individuals with insulin-dependent diabetes as candidates for police officer violates the Ohio Civil Rights Act, O.R.C. § 4112.02, and it is

Ordered that the City of Toledo is permanently enjoined from imposing a blanket exclusion of persons with insulin-dependent diabetes from employment as police officers for the City of Toledo, and it is

Further Ordered that Plaintiff's Motion For Leave To File Amended Complaint is Granted, and it is

Further Ordered that all other outstanding motions are denied as moot.

IT IS SO ORDERED.