**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,**
Plaintiff,

v.

The **CHRYSLER CORPORATION,**
Defendant.

Civil A. No. 94–CV–74979–DT.

United States District Court,
E.D. Michigan,
Southern Division.

March 6, 1996.

Bart M. Feinbaum, Equal Employment Opportunity Commission, Detroit, MI, for Plaintiff.

Camille Stearns Miller, Lewis, White & Clay, Detroit, MI, for Defendant.

### MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

FRIEDMAN, District Judge.

This matter is presently before the court on Plaintiff Equal Employment Opportunity Commission's motion for partial summary judgment and Defendant Chrysler Corporation's motion for summary judgment, both filed December 4, 1995. Pursuant to E.D.Mich. LR 7.1(e)(2), these motions shall be decided without oral argument. Accordingly, the hearing scheduled for January 31, 1996, is adjourned.

### BACKGROUND

This is an employment discrimination case in which the Equal Employment Opportunity Commission ("EEOC") brings suit on behalf of David Darling against the Chrysler Corporation. Darling, a heavy industrial electrician for 25 years, applied for a position as an electrician with Chrysler on July 20, 1993. Plaintiff explains that Darling did not apply for employment at any particular Chrysler facility but instead submitted his application to Chrysler's Mount Elliot Tool and Dye facility, which accepts and initially processes applications from skilled tradespeople in the Detroit metropolitan area. Plaintiff claims that Darling sought broad employment with "Chrysler Corporation or subsidiaries." Darling's employment application, Plaintiff's Exhibit 6. The Mount Elliot Tool and Dye facility forwarded Darling's application to the Sterling Heights Stamping plant, which had a vacancy for an electrician at that time.

Darling was interviewed by James Allan, the facilities manager at the Sterling facility. Allan testified that Darling's application stood out because he was the only applicant who had trained other electricians. Allan dep., p. 86. Darling had taught electrical school and welding school. *Id.* at 85. Allan testified that he gave his approval to hire Darling as an electrician, pending the results of drug and medical tests. *Id.* at 89–90. Darling was then offered a position by Tracy Gillespie, the employment supervisor in the Personnel Department at the Sterling plant. However, Darling was required first to pass the company medical examination.

Darling's drug test revealed that his blood sugar level was high. Although Darling suspected that he might be diabetic, he had never been treated for diabetes. After being informed that his blood sugar level was elevated, he scheduled an appointment with a private physician, Dr. Bradley C. Berger. As part of Chrysler's medical examination Darling completed a medical history ques-

tionnaire in which he reported that he had diabetes. On September 24, 1993, he was examined by Dr. Kebuter Onder, the Sterling plant physician. She determined that his blood sugar level was elevated because his drug test revealed that he was spilling "four-plus sugar" into his urine. Onder dep., p. 100. Onder testified that a normal fasting blood sugar level is between 65 and 110 mg/dl. *Id.* at 128.

Upon examination, Dr. Berger diagnosed Darling as having Type II diabetes mellitus, a condition characterized by hyperglycemia, or elevated blood sugar. At that time, Darling's blood sugar level was 219 mg/dl. Berger's medical notes, Plaintiff's Exhibit 18. Berger placed him on a diet but did not prescribe medication for him. In a letter, Dr. Berger stated Darling's diagnosis and treatment, that he would see Darling again for a recheck, and that he would "most likely" place him on medication for his condition. Berger letter, October 4, 1993, Plaintiff's Exhibit 19. Berger concluded, "He is able to work without restrictions and he will be coming back to see me in the office in the near future." *Id.*

On October 11, 1993, Darling had another appointment with Berger. On October 13, 1993, Berger prepared a second letter stating that Darling had been watching his diet well and his random blood sugar level was 136 mg/dl. Berger letter, October 13, 1993, Plaintiff's Exhibit 21. He explained that Darling did not need medication at that time and that his condition was being controlled with only diet therapy. He further stated: "He does not show any diabetic complications and I will be seeing him back in the future to determine whether he needs to be placed on medications ..." *Id.* It is undisputed that both of Berger's letters were provided to the Sterling plant.

On October 19 and 26, 1993, Darling took blood fasting tests, as required by Chrysler. Darling's blood sugar levels were 235 mg/dl and 216 mg/dl, respectively. As a result of Darling's tests, Dr. Onder would not authorize him for hire because she believed his blood sugar level was too high. Onder testified that generally an employee will not pass the medical examination if his/her blood sug-

ar level is greater than 140 mg/dl. Onder dep., p. 73–75.

Onder issued two physical restrictions (PQX) on Darling. He was issued a PQX of 40, which prohibits climbing. Onder also issued a PQX of 140, which required Darling to perform floor level work only and prohibits operation of moving machinery and work near open pits and chemical or fire hazards. A PQX of 140 also indicates that the person is subject to dizziness, fainting, or convulsions. Onder dep., pp. 150–151.

On November 22, 1993, Berger examined Darling again. Although his blood sugar level had dropped to 122 mg/dl, Berger prescribed Darling 5 mg. of glucotrol to be taken daily. In a third letter, dated December 6, 1993, Berger explained that over the past six weeks Darling's blood sugar level "has been normal." Berger's letter, December 6, 1993, Plaintiff's Exhibit 37. Berger further explained that Darling's diabetes is "under good control with diet and medication." *Id.* Berger stated that he would continue to see Darling in the future and that "he is able to work without restriction at the present time." *Id.*

On December 1, 1993, Gillespie notified Darling that his offer of employment with Chrysler was being withdrawn because his blood sugar level was too high. Darling subsequently filed an employment discrimination complaint with the EEOC, which instituted the instant action on behalf of Darling on December 13, 1994. The EEOC alleges that Chrysler discriminated against Darling on the basis of a disability, diabetes, violating the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* The EEOC seeks a permanent injunction enjoining Chrysler from engaging in any employment practice which discriminates on the basis of disability. The EEOC further seeks backpay and benefits for Darling and compensation for non-pecuniary losses, including emotional pain and suffering. Plaintiff also seeks punitive damages.

In October 1994, Chrysler contacted Darling to offer him a position as an electrician at its Highland Park corporate headquarters, which Darling accepted. Currently, Darling

is an employee of Chrysler. The EEOC concedes that Darling's damages are limited to backpay and benefits for a period of approximately one year, from the date Chrysler revoked its offer of employment to the date Darling was hired at Highland Park.

On December 4, 1996, both parties filed the instant motions for summary judgment.

## DISCUSSION

### I. Summary judgment standard

Summary judgment is appropriate if

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). Once a properly supported summary judgment motion has been filed, the burden is on the party opposing summary judgment to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* dispute as to any *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986) (emphasis included). Viewing the evidence "in the light most favorable to the opposing party," *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970), summary judgment should be entered only if the evidence is so one-sided that a reasonable factfinder could not find for the opposing party. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248–50, 106 S.Ct. at 2510–11; *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478–80 (6th Cir.1989). In other words, "[a] material issue of fact exists where a reasonable jury, viewing the evidence in the light most favorable to the non-moving party, could return a verdict for that party." *Vollrath v. Georgia–Pacific Corp.*, 899 F.2d 533, 534 (6th Cir.1990).

### II. The Americans with Disabilities Act

The Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(a), provides:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). The purpose of the act is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). The ADA was adopted by Congress after finding that "historically, society has tended to isolate and segregate individuals with disabilities" and that "people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally." 42 U.S.C. § 12101(a). Congress further found that individuals with disabilities have been

> subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society.

*Id.*

■ To sustain a claim under the ADA, a plaintiff must establish 1) that he is a disabled person within the meaning of the ADA; 2) that he is qualified; and 3) that the employer terminated him because of his disability. *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1123 (10th Cir.1995).

### A. Disability

The parties dispute whether Darling suffers from a disability, as defined by the ADA:

> The term "disability" means, with respect to an individual—
>
> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or
(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). With respect to the major life activity of working, the term "substantially limits" means:

significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.

29 C.F.R. § 1630.2(j)(3)(i). "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Id.*

"Regarded as having such an impairment" means that an individual "has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation." Title 29 C.F.R. § 1630.2(*l*)(1).

█ The EEOC argues that Darling is disabled because Chrysler regarded him as having an impairment that substantially limited his major life activity of working. Plaintiff notes that the proper test for whether a perceived impairment substantially limits a major life activity "is whether the impairment, *as perceived,* would affect the individual's ability to find work across the spectrum of same or similar jobs." *Partlow v. Runyon,* 826 F.Supp. 40, 44 (D.N.H.1993) (emphasis included). Plaintiff argues that Darling's impairment, as perceived, affected his ability to find work because Chrysler revoked his offer of employment based upon his elevated blood sugar level.

The EEOC points to the work restrictions which Onder placed on Darling as evidence that Chrysler regarded his impairment as a substantial limitation on his ability to perform a broad range of jobs. Onder testified that if someone has a PQX of 40, he is disqualified from climbing in any job in the factory. Onder dep., p. 149. Moreover, someone with a PQX of 140 is not allowed to work in any job which requires operating moving machinery or working near open pits and chemical or fire hazards. *Id.* at 151.

Furthermore, someone with a PQX of 140 is considered to be subject to dizziness, fainting, or convulsions and is permitted to perform floor level work only. *Id.* at 150–151.

Finally, the EEOC relies on the testimony of James Daly Allan, who interviewed Darling at Chrysler. He testified that because Darling did not pass the medical exam, he would not have had the authority to hire him as a pipefitter, millwright, sheet metal worker, welder, machine repairer, or a hi-lo mechanic, assuming that he was otherwise qualified for these positions. Allan dep., pp. 111–112. Plaintiff argues that Allan's testimony establishes that the work restrictions placed on Darling prevented him from working in a broad category of skilled trade jobs.

Defendant Chrysler disputes that it regarded Darling as having an impairment which significantly restricted his ability to perform a broad range of jobs. First, Chrysler disputes the EEOC's characterization of Allan's testimony. Defendant argues that Allan testified only that he did not have the authority to hire anyone who is not first approved by the Personnel Department. Allan dep., p. 110.

█ Chrysler contends that because it only disqualified Darling from the position of electrician at its Sterling plant, Darling was not significantly restricted in his ability to perform a class of jobs or a broad range of jobs in various classes. Defendant stresses that "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i). Defendant relies on *Partlow v. Runyon,* 826 F.Supp. 40 (D.N.H.1993), also cited by Plaintiff, where the court held that the plaintiff's perceived impairment (chronic limbo-sacral strain) did not render him "handicapped" within the meaning of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.,* where the defendant U.S. Postal Service refused to hire him as a vehicle mechanic due to his condition.[1] The court found that the plaintiff's perceived impairment would not qualify as a substantial limitation on his ability to find work because "[i]t

---

1. Case law analyzing the Rehabilitation Act, after which the ADA is modeled, is used to interpret the ADA. *See Sarsycki v. United Parcel Service,* 862 F.Supp. 336, 341 n. 2 (W.D.Okla.1994).

is not apparent that all auto-mechanic employers in New Hampshire would impose the same requirements as the Postal Service ..." *Id.* at 46. The court further explained:

> Even if auto-mechanic employers would generally perceive Partlow's impairment in the same way as the Postal Service did, he still would probably not be disqualified from so many auto-mechanic-type jobs that such a perception would pose a significant impediment to his finding work.

*Id.*

Defendant also notes that because Darling only applied for one position, that of electrician, he was never considered for other jobs. Therefore, Chrysler argues, he could not have been disqualified from any other positions.

Plaintiff argues that the issue is not whether Darling only applied for one position but whether Chrysler perceived Darling as being disabled from working in a class of jobs or a broad range of jobs in various classes. And, as discussed earlier, Plaintiff argues that Chrysler's imposition of work restrictions on Darling establishes that Chrysler did perceive Darling as incapable of working in a broad range of jobs. Plaintiff explains that if Defendant's argument were accepted, few skilled tradespeople would receive ADA protection because most, like Darling, only apply for the particular position for which they are trained. *See Partlow*, 826 F.Supp. at 44.

The court finds that Darling does suffer from a "disability" within the meaning of the ADA. It is clear that Chrysler regarded Darling as having an impairment which significantly restricted his ability to perform either a class of jobs or a broad range of jobs in various classes. *See* 29 C.F.R. § 1630.2(j)(3)(i). Although Chrysler withdrew its offer for the position of electrician at its Sterling plant only, it did not offer or consider Darling at that time for any other position at either Sterling or another plant. It was not until a year later, after Darling had already filed a complaint with the EEOC, that Chrysler offered him a position at its Highland Park facility. The court finds it significant that not only did Chrysler disqualify Darling from the position of electrician, but it also imposed work restrictions on

him which effectively precluded him from a wide range of other jobs within the Chrysler Corporation.

### B. Darling's qualifications

■ The parties also dispute whether Darling was otherwise qualified for the position of electrician at Chrysler. The parties agree that based on his 25 years of experience, Darling was technically qualified for the job. Allan testified that he was impressed with Darling's credentials and experience and recommended him for hire. *See* Allan dep., pp. 85–86, 89–90.

Plaintiff points to Darling's affidavit in which he explains that he previously worked in several electrical positions and never had any problems with his diabetes. *See* Darling affidavit, Plaintiff's Exhibit 16. Darling states that he never had to miss work due to his condition and never had any problems performing similar work which required physical exertion. *Id.*

Defendant argues that Darling was not qualified, however, because he did not pass Chrysler's medical examination. Defendant contends that Darling's high blood sugar level rendered him unqualified for the job because he was unable to perform some of the essential functions of an electrician at the Sterling plant. Chrysler asserts that Darling, with or without reasonable accommodation, would not have been capable, on a regular basis, of laying, maintaining or repairing motors, generators, transformers, and other devices, in elevated places. In support of its argument, Defendant relies on the first two letters written by Dr. Berger. Defendant argues that Berger implied that future and long term care and monitoring was required to control Darling's diabetes and that future use of insulin and other medications was a "high probability." Defendant's response, p. 9. Defendant explains that since November, 1993, Darling has taken medication to control his diabetes. *Id.* Defendant then asserts, without support, that "[w]ith *uncontrolled diabetes,* Darling could not perform the essential functions of employment ..." *Id.* at 10 (emphasis included).

Defendant implies that Darling's need for medication indicated the seriousness of his condition, which rendered him unqualified for the position, while arguing at the same time that he was not hired because his diabetes was uncontrolled. The court finds Defendant's arguments disingenuous. It is clear that Darling was in fact controlling his diabetes. He immediately sought the care of a private physician, with whom he had regular examinations. Berger's letters indicate that he monitored Darling's condition very closely, first recommending diet and exercise and then medication. Although Chrysler implies that Darling's need for medication rendered him unfit for his job, the court believes that it shows that he was appropriately controlling his condition. It seems that Chrysler ignored evidence that Darling was receiving appropriate care and treatment. As discussed below in section C, Chrysler fails to show how Darling, who was placed under the care of a physician and took medication to control his condition, was unqualified for the position he sought.

Furthermore, the court believes that Defendant has mischaracterized Dr. Berger's letters. Instead of conveying that Darling's diabetes was serious and/or uncontrollable, as Defendant implies, Berger is optimistic. In both letters, Berger explains that he is treating Darling's diabetes with diet therapy and that he will continue to see him. In the October 4, 1993, letter, Berger does not claim that there is a "high probability" that Darling will need to take medication, as Defendant contends, but instead states that Darling will "most likely" be placed on medication. *See* Berger letter, October 4, 1993. In his second letter of October 13, 1993, Berger states that he will be seeing Darling again "to determine whether he needs to be placed on medications ..." *See* Berger letter, October 13, 1993. Berger also states that Darling "does not show any diabetic complications." *Id.* Most importantly, in his first letter, Berger clearly states that Darling "is able to work without restrictions." *See* Berger letter, October 4, 1993.

The court finds that Plaintiff has shown that Darling was in fact qualified for the position at Chrysler. Defendant has failed to show that Darling's condition rendered him incapable of performing his job responsibilities. The court finds it significant that Darling avers that he never experienced any problems performing electrical work due to his diabetes. *See* Darling affidavit.

### C. Direct threat

■ Chrysler asserts, as an affirmative defense, that Darling's offer of employment was revoked because his elevated blood sugar level posed a "direct threat" to the health or safety of other workers at the Sterling plant. Title 42 U.S.C. § 12113(a) provides:

> It may be a defense to a charge of discrimination under this chapter that an alleged application of qualification standards, tests, or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation, as required under this subchapter.

Title 42 U.S.C. § 12113(b) further provides:

> The term "qualification standards" may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace.

The term "direct threat" is defined as a "significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). A slightly increased risk is not enough, however; a "high probability" of substantial harm is required. *See* Appendix to Part 1630, Interpretive Guidance on Title I of the Americans with Disabilities Act, 29 C.F.R. § 1630.2(r). A speculative or remote risk is insufficient. *Id.*

The determination that an individual poses a "direct threat" must be based on an individualized assessment of the individual's ability to perform safely the essential functions of the job. 29 C.F.R. § 1630.2(r). The factors to consider in determining whether an individual poses a direct threat are: 1) the duration of the risk; 2) the nature and severity of the potential harm; 3) the likelihood

that the potential harm will occur; and 4) the imminence of the potential harm. *Id.*

The analysis for determination of "direct threat" is similar to that in the preceding section. That is, as framed by the parties, whether Darling was qualified for the position is an issue closely related to whether he posed a "direct threat." Here, however, it is Defendant's burden to prove that Darling was in fact a "direct threat."

Defendant contends that it performed an individualized assessment of Darling based on the three blood sugar tests it administered to him over a two to three week period. Defendant also relied on Dr. Berger's correspondence which indicated a likelihood that Darling's condition would have to be controlled by medication in the future. From these sources, Defendant concludes that "it is clear that Darling posed a direct threat to himself and others." Defendant's response, p. 14. Defendant also contends that the increased risk of sudden blurred or lost vision, a possible complication of diabetes, constituted a danger to Darling and his coworkers. Defendant explains, "For example, Darling could easily fall from an elevated place or heavy equipment descending to the ground or on top of another co-worker. There are any number of unforeseen dangerous occurrences stemming directly from Darling's potential impaired vision." *Id.* at 15.

Despite Defendant's ominous predictions, it has no evidence to support its assertion that Darling posed a direct threat to himself or his coworkers. Nor has Defendant established, as it contends, that it performed an individualized assessment of Darling's condition. The administration of three blood sugar tests hardly constitutes an individual assessment as contemplated by 29 C.F.R. § 1630.2(r).

Although Dr. Onder met with Darling, the evidence reveals that she did not examine him in a manner that amounts to an individualized assessment. Onder's testimony establishes that she did not question Darling about his past or current health. Onder testified that she did not ask Darling whether he was experiencing any diabetes-related complications and that Darling did not complain to her of any such problems. Onder dep., pp. 111–112. Although she restricted his ability to work, assuming that he would suffer from dizziness, fainting, or convulsions, she did not ask him if he had ever experienced these conditions while working as an electrician for 25 years. Onder dep., p. 105. Neither did she ask him if he suffered from polyuria (excessive urination) or polydipsia, symptoms commonly associated with diabetes. *Id.* at 109–111. In fact, Onder responded flippantly when questioned about her examination of Darling:

Q: Okay. Polyuria is also a symptom of Type Two diabetes; is it not?

A: That's right.

Q. And did you observe any symptoms of Mr. Darling suffering from polyuria at the time that you examined him on September 24, 1993?

A: If he is in my office half an hour, how I should know polyuria?

Q: I'm just asking.

A: That is impossible. How often he went to the bathroom, I don't know.

Q: Did you ask Mr. Darling whether he was experiencing any problems going to the bathroom?

A: No.

Onder dep., p. 109. It is obvious that an individualized assessment of Darling's ability to perform safely the functions of his job would include consideration of his medical history. Instead, Onder testified that it was "not necessary" to ask Darling if he had ever experienced any diabetic-related complications in his prior jobs because "[t]hey always lie." *Id.* at 105.

The minimal examination which Onder did perform revealed that Darling did not suffer from any diabetes-related complications. Onder testified that Darling's eye examination was normal, and there was no evidence of retinopathy, a symptom associated with Type Two diabetes. *Id.* at 106. Onder further testified that Darling did not appear to suffer from neuropathy or nephropathy. *Id.* at 106, 108.

Onder admitted that she determined Darling posed a threat based on the experiences related to her by other employees about their

diabetic conditions, not on an individual assessment of Darling. *See* Onder dep., pp. 82, 139, 145, 155. Onder testified that other than Darling's blood sugar level, he exhibited no indications that he would pose an imminent risk of injuring himself. *Id.* at 137, 141. Onder further testified that she was not able to specify the likelihood that Darling would injure himself at work due to his elevated blood sugar level. *Id.* at 140, 143. Onder admitted that she was merely speculating as to what might happen to Darling in the future. *Id.* at 140. The following exchange clearly reveals that Onder based her decision solely on Darling's blood sugar level and not on any information which she elicited from him about his medical history:

Q: Did Mr. Darling ever tell you at any time that he had any problems with dizziness, fainting, or convulsions?

A: **Mr. Darling never told me anything.**

Q: What evidence did you have at the time that you completed this form that Mr. Darling was subject to dizziness, fainting or convulsions?

A: **Blood sugar level.**

*Id.* at 151 (emphasis added). Moreover, Onder testified that she could not identify any medical literature or studies which suggest that individuals with diabetes are more prone to on-the-job injuries or are greater safety risks. *Id.* at 90–91, 100–101.

It is apparent that the conclusions of Dr. Berger, who conducted a more thorough medical examination of Darling, were ignored by Onder. As discussed above, Dr. Berger concluded that Darling was able to work without restrictions. Onder admitted that she read Berger's October 4, 1993, letter but did not assign it much, if any, credibility. When asked about Berger's statement that Darling did not require work restrictions, Onder replied, "[A]ny doctor can write that." *Id.* at 122.

Contrary to Defendant's assertion, it appears that Dr. Onder did not make an individualized assessment of Darling's ability to perform safely the essential functions of the job, as required by 29 C.F.R. § 1630.2(r). The court finds that Defendant fails to provide evidence that Darling posed a direct threat to himself and/or his coworkers. In fact, the evidence reveals that Darling did not pose a danger to himself or others. Darling states that he has never experienced any problems at work due to his diabetes. Darling affidavit, Plaintiff's Exhibit 16. Dr. Berger, who did perform an individual assessment of Darling, found that Darling did not require any work restrictions. Berger letter, October 4, 1993, Plaintiff's Exhibit 19. In addition, Darling's diabetes was being controlled through Berger's treatment and care, and eventually, by medication.

Although the court usually does not have the advantage of hindsight, it does in this particular case. One year after Defendant revoked Darling's offer, it hired him to work as an electrician at its Highland Park facility. Darling testified that his job responsibilities at the Highland Park facility are generally the same as those at the Sterling plant. Darling dep., pp. 125–6. Darling explained that 15–20 percent of the work at Sterling would have been in elevated places, while approximately 20 percent of his work at Highland Park is spent elevated, with 10 percent spent below ground working in tunnels and pits. *Id.* at 68, 129–130. Neither party alleges that Darling has had any problems or injuries during his employment at the Highland Park facility as a result of his diabetes.

In sum, it is clear to the court that in revoking Darling's offer of employment, Defendant relied on mere speculation that Darling posed a danger to himself and others. The court notes that a speculative or remote risk is insufficient to establish a "direct threat" defense. *See* Appendix to Part 1630, Interpretive Guidance on Title I of the Americans with Disabilities Act, 29 C.F.R. § 1630.2(r). Defendant fails to provide any evidence that there was in fact a "high probability" of substantial harm to the health or safety of others. *Id.;* 42 U.S.C. § 12111(3).

### D. *Blanket exclusion*

■ Plaintiff argues that Chrysler's policy of not authorizing employment for an individual with a blood sugar level of greater than 140 mg/dl is a blanket exclusion violative of the ADA. Plaintiff relies on *Stillwell v. Kan-*

*sas City, Mo. Bd. of Police Commissioners,* 872 F.Supp. 682 (W.D.Mo.1995) (holding that an across-the-board exclusion of persons with one hand as armed security guards violates the ADA) and *Bombrys v. City of Toledo,* 849 F.Supp. 1210 (N.D.Ohio 1993) (finding that a rule prohibiting persons with insulin-dependent diabetes from employment as police officers is a blanket exclusion violative of the ADA). Both of these cases emphasize the ADA's requirement of a case-by-case analysis of disabled individuals "to *accurately* determine what risks, if any, they pose to themselves or the public." *Stillwell,* 872 F.Supp. at 687 (emphasis included). "An individualized assessment is absolutely necessary if persons with disabilities are to be protected from unfair and inaccurate stereotypes and prejudices." *Bombrys,* 849 F.Supp. at 1219. Both courts also stress that blanket exclusions "are to be given the utmost scrutiny," *Bombrys,* 849 F.Supp. at 1219–1220, and are "highly suspect." *Stillwell,* 872 F.Supp. at 686. Moreover, blanket exclusions were found to be "inconsistent with the ideals of the Due Process Clause of the Fourteenth Amendment." *Bombreys,* 849 F.Supp. at 1221.

Defendant denies that it has a blanket exclusionary policy. Defendant argues that each individual applicant is examined for the particular position's requirements and that medical standards are used merely as guides in determining an applicant's compatibility with a particular job in a particular plant. For support, Defendant points to Dr. Onder's testimony in which she states that she might allow a person to work with a blood sugar level of slightly above 140 mg/dl. Onder dep., p. 75. Defendant argues that this establishes that Chrysler does perform an individual assessment of each applicant.

As discussed above, the court finds that Defendant failed to prove that it performs individualized assessments of its applicants for employment. Defendant's treatment of Darling reveals that it relies primarily on a number, which represents the individual's blood sugar level, rather than considering the applicant's medical history to determine his/her real ability to perform the job. However, if Defendant truly does not have a blan-

ket exclusionary policy, then it should welcome this court's injunction prohibiting it from applying any policy which automatically excludes from employment an individual with a blood sugar level of greater than 140 mg/dl. The court finds that any such blanket exclusionary policy violates the ADA.

For the reasons stated above,

IT IS ORDERED that Plaintiff's motion for partial summary judgment is granted.

IT IS FURTHER ORDERED that the issue of damages remains.

IT IS FURTHER ORDERED that Defendant Chrysler is permanently enjoined from enforcing any policy which automatically excludes from employment an individual with a blood sugar level of greater than 140 mg/dl, or any similar blanket exclusionary policy which discriminates against persons with disabilities.

IT IS FURTHER ORDERED that Defendant's motion for summary judgment is denied.