John **KVINTUS**, Plaintiff,

v.

**R.L. POLK & CO.,** Defendant.

No. 97–CV–74090–DT.

United States District Court,
E.D. Michigan,
Southern Division.

April 7, 1998.

Marvin D. Sharon, Royal Oak, MI, for Plaintiff.

William B. Balke, Detroit, MI, for Defendant.

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

DUGGAN, District Judge.

### Opinion

This matter is currently before the Court on defendant's motion for summary judg-

ment. Plaintiff has filed a response in opposition to the defendant's motion. On April 2, 1998, the Court held a hearing on defendant's motion. For the reasons that follow, the Court grants defendant's motion for summary judgment on all of the claims presented.

### Background

On March 6, 1997, plaintiff filed a complaint in Wayne County Circuit Court against R.L. Polk & Co. ("Polk") and Paul Inson following his termination from defendant Polk's employ. In his complaint, plaintiff alleges that defendant discriminated against him in violation of the Americans with Disabilities Act ("ADA") and the Michigan Handicappers' Civil Rights Act ("MHCRA") in making the decision to eliminate plaintiff's position within defendant's company and terminate him. Plaintiff also asserts that defendant breached its contract with plaintiff by terminating him in the absence of just cause. On August 11, 1997, defendant removed this action to this Court. The Court entered an Order of Dismissal as to defendant Paul Inson on December 8, 1997. This motion addresses plaintiff's remaining claims against defendant Polk.

Plaintiff was employed with the United States Air Force from 1962 until June of 1984. (Kvintus Dep. at 69). Plaintiff asserts that sometime in 1983 a military physician diagnosed him as suffering from "post-Vietnam stress disorder" ("PVSD"). (Kvintus Dep at 238).

Plaintiff began his employment with defendant in June of 1984 in the capacity of a Systems Analyst ("SA") in the production department of defendant. Shortly after plaintiff's hire, he transferred to the automotive department where he assumed the position of SA on the Ford team. During plaintiff's tenure in the automotive department, his job title changed twice from SA to Project Coordinator ("PC"), and from PC to Senior Systems Developer ("SSD"); however, plaintiff's job duties remained, for the most part, unchanged. (Kvintus Dep. at 304–305, 452–454).

In February of 1995, plaintiff decided to take a medical leave of absence because of "stress." (Kvintus Dep. at 253, 254). During this same period—late 1994 to early 1995—defendant reorganized its departments in an effort to downsize its operations. As a result of this reorganization, defendant consolidated the job positions of SA, PC, and Systems Programmer into the position of SSD. (Kvintus Dep. at 454, 476). Upon his return from medical leave in May of 1995, plaintiff was offered the position of SSD on the Ford team. Paul Inson, defendant's Director of Human Resources, extended to plaintiff this offer of employment. (Kvintus Dep. at 296–297; Df.'s Mot. S.J. Exh. 16). Plaintiff accepted defendant's offer and assumed the duties of SSD on the Ford team.

At the time plaintiff agreed to assume the position, the Ford team consisted of eight people. (Kvintus Dep. at 451). In September of 1995, defendant decided to combine the Ford team with another project team known as Eastern Imports. (Kvintus Dep. at 509). Defendant states that the decision to combine the teams was a result of declining work loads on both teams. (Lesinski Dep. at 29–30). Defendant also states that the Ford Team Manager position held by Eugene Abbo was eliminated and that individual was never replaced. (Lesinski Dep. at 29–30). Subsequent to Abbo's departure, Tim Sobka, a Systems Engineer, also left defendant's employ and the company elected not to fill his position. In January of 1996, the remaining Ford team members were Ann Feidor, Project Manager; Wait Kabalka, SSD; Karen Teachout, SSD; Laura Hacket SD; Joanne Marculewicz, Account Representative; and plaintiff, SSD. Three individuals were responsible for management and supervision of the Ford and Eastern Import teams in the following hierarchy: Bruce Buddenborg, Mike Lesinski, and Ann Feidor.

In June of 1996, plaintiff experienced a confrontation with Project Manager Feidor over the handling of a schedule for Joe Toth, a Ford account sales representative. Toth did not receive a schedule from plaintiff on time so he called a meeting of the Ford team staff. At the meeting, there was discussion about attempting to accommodate the scheduling requests of Toth. Plaintiff admits that he was angry at Feidor over Feidor's expressing sympathy for Toth and admits that

during the meeting he slammed his hands on the table. (Kvintus Dep. at 651–652). Feidor informed Mike Lesinski, then supervisor of the Ford team, about Kvintus' conduct at the meeting. According to Toth, the scheduling conflict was ultimately resolved and he did not cancel the job, nor complain to any management about plaintiff's allegedly inappropriate behavior. (Toth Dep. at 54–55). Following the incident with Toth, plaintiff left for the remainder of June of 1996 on a scheduled vacation to California.

Following the confrontation with Feidor, defendant states that Lesinski felt that plaintiff may benefit from time off work and approached Inson about the prospect of affording plaintiff the opportunity for a medical leave. (Lesinski, 69–70). Inson then scheduled meetings with several of the management personnel. Among those with whom Inson met were Feidor, Lesinski, and Bruce Buddenborg, Lesinski's and Feidor's supervisor. (Inson Dep. at 50–51). Inson's notes reflect that these individuals described plaintiff as "disorganized," "delusional," "confrontational," "making a mistake that cost the company $40,000" and suffering from "erratic behavior." (Inson Dep. at 50–66; Df.'s Exh. 20; Pl.'s Exh. D). In late June of 1996, Inson contacted Ann West, an industrial psychologist, in an attempt to ascertain the appropriate method to deal with plaintiff. (Inson Dep. at 91–92). According to Inson, West offered several suggestions on how to approach plaintiff about the prospect of taking a medical leave of absence. (Inson Dep. at 93–94).

On July 9, 1996, plaintiff met with Lesinski and Inson at the suggestion of Inson. (Lesinski Dep. at 73, Inson Dep. at 105–106). Defendant offered plaintiff the opportunity for a paid leave of absence. Plaintiff contends that he expressed reluctance to leave and feared that his position would not remain open upon his return from the leave. In contrast, defendant contends that Inson and Lesinski assured plaintiff that he could continue to work if he elected not to take time off. (Lesinski Dep. at 71; Inson Dep. at 113). Plaintiff elected to take the leave and began treatment with Rose Kazma, MA LLP, who diagnosed plaintiff as suffering from adjustment disorder with mixed anxiety and depressed mood. (Df.'s Exh. 21). After plaintiff's term of leave at full pay expired, plaintiff extended his leave three more times, taking off approximately five months. (Kvintus Dep. at 745–747). Plaintiff worked for his wife's day care facility during the time in which he was out on medical leave. (Kvintus Dep. at 823).

In November of 1996, defendant eliminated two positions on the Ford team. Feidor's position as Project Manager was eliminated and she was promoted to the Ford team manager, the position previously held by Lesinski. (Feidor Dep. at 26–28). With respect to the second position, defendant alleges that in late November 1996, Feidor met with the four active members of the Ford team—Feidor, Teachout, Kabalka, and Marculewicz—where it was "jointly determined" that the team no longer required three SSD positions. (Feidor Dep. at 27–28). Feidor then met with Buddenborg and both of them allegedly assessed that plaintiff was the least qualified because he did not possess programming skills and displayed a resistance to learning new technology. (Feidor Dep. at 26–28; Buddenborg Dep. at 37–38). Buddenborg and Feidor then reported to Inson who told them to delay the decision until plaintiff's return from disability leave. (Inson Dep. at 133). In contrast, plaintiff contends that the decision to terminate him was not made until after he returned from his leave in December, 1996. Plaintiff also states that his position was the only position eliminated on the Ford team, and that this "elimination" was not on account of any economic or financial reasons.

On December 16, 1996, plaintiff returned from disability leave and presented Inson with a return to work slip. (Kvintus Dep. at 805; Inson Dep. at 129). Defendant alleges that plaintiff was promptly sent home because a decision regarding the elimination of his position was put on hold until plaintiff's return. According to defendant, Inson asked Feidor and Buddenborg to document their mutual assessment of the qualifications of the SSD position on the Ford team. (Inson Dep. at 131–133). Inson approved the decision to eliminate plaintiffs position. (Inson Dep. at

39–43). Defendant states that Inson and Buddenborg then attempted to find plaintiff a position within the company that matched plaintiff's skill set. (Inson Dep. at 141–144; Buddenborg Dep. at 69–72). On December 19, 1996, Inson and Buddenborg met with plaintiff to inform him of the elimination of his position and to offer him defendant's standard severance package and out placement services. (Kvintus Dep. at 595). Inson states that he told plaintiff to remain in contact with the company regarding the potential for future employment. Plaintiff states that he did not contact Inson about possible openings and discontinued using the out placement counselor's services. (Kvintus Dep. at 850–51).

### Standard of Review

Rule 56 (c) of the Federal Rules of Civil Procedure mandates the entry of summary judgment when "the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. There is no genuine issue of material fact for trial unless, by viewing the evidence in favor of the nonmoving party, a reasonable jury could return a verdict for that party." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Boddy v. Dean,* 821 F.2d 346, 349 (6th Cir.1987). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which establish the absence of a material issue of fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Potters Medical Center v. City Hospital Association,* 800 F.2d 568, 572 (6th Cir.1986). Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and come for-

ward with specific facts to show that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 322–24, 106 S.Ct. 2548. The non-moving party must do more than show that there is some metaphysical doubt as to the material facts. It must present significant probative evidence in support of its opposition to the motion for summary judgment in order to defeat the motion for summary judgment. *Moore v. Philip Morris Companies, Inc.,* 8 F.3d 335, 339–40 (6th Cir.1993). If, after adequate time for discovery, the party bearing the burden of proof fails to make a showing sufficient to establish an essential element of his claim, summary judgment is appropriate. *Celotex,* 477 U.S. at 322–24, 106 S.Ct. 2548.

### Analysis

#### Plaintiff's Claim of Disability Discrimination

Plaintiff has alleged that defendant discriminated against him on the basis of his disability by terminating him in violation of the ADA and the MHCRA.[1] The ADA provides:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

The purpose of the act is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Plaintiff claims that defendant discriminated against him on the basis of his disability, i.e., PVSD and depression, or alternatively, that defendant regarded him as disabled in making its decision to eliminate plaintiff's position on the Ford team. Defendant contends that plaintiff has failed to establish a prima facie case of disability discrimination in violation of the ADA.

---

1. The Court notes that "analysis of claims under the MHCRA largely parallels analysis under the ADA." *Fritz v. Mascotech Automotive Systems Group Inc.,* 914 F.Supp. 1481, 1491 (E.D.Mich. 1996) (citing *Sherman v. Optical Imaging Sys.,* Inc., 843 F.Supp. 1168, 1180–81 (E.D.Mich. 1994)). In order to facilitate this Court's review, plaintiff's claims under the ADA and the MHCRA will be treated in one discussion.

In order to establish unlawful discrimination under the ADA, plaintiff may introduce direct evidence that the employer relied on the plaintiff's disability in making an employment decision. *See Terbovitz v. Fiscal Ct.*, 825 F.2d 111, 114–15 (6th Cir.1987) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985)). In the alternative, plaintiff may introduce indirect evidence of discrimination to shift the burden of production to the employer to articulate a legitimate non-discriminatory reason for the adverse employment decision. *See Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173 (6th Cir.1996). Thus, in cases in which the plaintiff is unable to proffer direct evidence of discrimination, plaintiff must establish his or her claim indirectly through the burden shifting mechanism espoused by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

■ Plaintiff argues that the present case may be construed as a direct evidence case because:

> While it differs from *Monette, id.*, [sic] in that Monette had a disability and the employer admitted as much, here the "evidence establishes" that Kvintus was "regarded as" having a disability and/or had a "disability." Defendant has essentially admitted that it relied on the Plaintiff's handicap symptoms in making its employment decision to put him out on leave and the evidence establishes that Defendant did not want him to return.

(Pl.'s Resp. at 30). In support of his direct evidence argument, plaintiff goes on to state that he was qualified to perform the duties of his position without accommodation and the burden is on the defendant to prove that it had a legitimate reason for not returning him to his position.[2] The Court does not believe that the present case should be analyzed under the direct evidence approach. While plaintiff alleges that defendant has "essentially admitted" to reliance on plaintiffs handicap in making the termination decision,

plaintiff does not point the Court to any evidence which would support such a finding. Plaintiff does not identify any individual in defendant's employ who made any inappropriate remarks that would support a claim of "direct discrimination," i.e., that discrimination was a motivating factor in defendant's decision to terminate plaintiff. The Court is not satisfied that plaintiff's conclusory allegation that defendant "essentially admitted" reliance upon plaintiff's "handicap symptoms" is sufficient to establish direct evidence that defendant relied upon plaintiff's disability in making its decision to terminate plaintiff. In the absence of direct evidence of discrimination, plaintiff will have to attempt to prove his case using the *McDonnell Douglas* burden shifting paradigm.

■ In order to establish a prima facie case of discrimination using indirect evidence, plaintiff must prove that (1) he is disabled; (2) he is otherwise qualified for the job, with or without reasonable accommodation; (3) he suffered an adverse employment decision; (4) the employer knew or had reason to know of his disability; and (5) after termination the position remained open while the employer sought other applications, or the disabled individual was replaced. *Monette*, 90 F.3d at 1186. "Proof of these five facts, in the absence of an explanation by the employer, creates a mandatory inference that the employer intentionally discriminated against the disabled individual by taking an adverse employment action 'solely' because of his or her handicap." *Id.* at 1185.

■ Defendant argues that summary judgment should be entered in its favor because plaintiff cannot establish the essential elements of a prima facie case. Specifically, defendant maintains that plaintiff cannot establish that he is "disabled" as contemplated by applicable ADA regulations because he cannot show that his disability, perceived or otherwise, substantially limits a major life activity. Second, defendant contends that plaintiff is unable to establish that subse-

---

**2.** Plaintiff's statement that the burden is on the defendant to prove it had a legitimate reason for not returning him to the position is inaccurate under the direct evidence approach. The Court entertains defendant's articulation of a legitimate nondiscriminatory reason for termination under the *McDonnell Douglas* indirect evidence approach. This, of course, occurs only after plaintiff has established a prima facie case creating, in effect, an inference of unlawful discrimination.

quent to his termination the position remained open or the plaintiff was replaced. Conversely, plaintiff responds that he meets the definition of disability because he has had a "diagnosed emotional or mental illness for at least 20 years." (Pl.'s Resp. at 28). Plaintiff states that this "emotional illness" substantially limits his life activities because he suffers from "loneliness" and "lack of sleep." In addition, plaintiff states that defendant "regarded" plaintiff as having a disability because defendant "encouraged" plaintiff to take a medical leave, treated plaintiff as a perceived threat to others, and described plaintiff as "delusional, erratic, and dysfunctional." (Pl.'s Resp. at 29).

Under applicable ADA regulations, the term disability is defined as follows:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). An ADA plaintiff must satisfy two requirements to establish a prima facie case of discrimination: (1) that the plaintiff has an impairment; and (2) that the impairment interferes with a major life activity. *Farmer v. National City Corporation*, No. C–2–94–966, 1996 WL 887478 *7 (S.D.Ohio April 5, 1996) (citing *Zatarain v. WDSU–Television, Inc.*, 881 F.Supp. 240, 242 (E.D.La.1995), *aff'd*, No. 95–30604, 79 F.3d 1143 (Feb. 7, 1996)). Defendant contends that plaintiff has failed to demonstrate that plaintiff's PVSD and depression interfere with a major life activity.

In interpreting the provisions of the ADA, courts are aided by definitions contained in the Code of Federal Regulations ("CFR"). The regulations define a "physical or mental impairment" as "[a]ny mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h)(2).

Plaintiff alleges that he has suffered from PVSD and depression since first diagnosed by a military physician in 1983. The Court will assume for purposes of this motion that plaintiff's PVSD and depression conditions qualify as a physical or mental impairment under 29 C.F.R. § 1630.2(h)(2). This, however, does not end the Court's analysis as the Court must also determine whether plaintiff's conditions interfere with a major life activity. The regulations guide the Court as to the types of activities which must be affected in order to come within the purview of the ADA. Major life activities encompass such functions as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

Defendant argues that plaintiff has failed to establish that his condition substantially affects any of his major life activities. Plaintiff responds that the Court should find a genuine issue of material fact with respect to whether he suffered from a "disability" under the ADA based on his PVSD and depression. In support of his argument, plaintiff states "he has been hospitalized, medicated, suffers from lack of sleep, loneliness." (Pl.'s Resp. at 28).

In his deposition, plaintiff testified as follows with respect to the impact that the PVSD and depression conditions have on his major life activities:

Question: Does it affect your ability to do anything that you do on a daily basis?

Answer: No, it doesn't.

Question: Has it ever affected your ability to do anything that you do on a daily basis?

Answer: No, it doesn't

Question: Is there anything that you consider yourself unable to do because of your post-Vietnam stress disorder or your depression?

Answer: No, there's nothing I can't do.

(Kvintus Dep. at 838–839). Subsequent to plaintiff's deposition testimony, plaintiff provided a sworn affidavit in which he avers that he has "slept less [sic] on the average less than four hours a night for more than 30 years. In May and June, your deponent slept approximately two to three hours a night." (Kvintus Aff. at 2, Pl.'s Exh. H). Plaintiff also provides the affidavit of Marija Dixon, Ph.D., who treated plaintiff for his

PVSD and depression.[3] Ms. Dixon states that plaintiff presented symptoms such as "poor sleep," "nightmare and night terrors," and "fatigue." (Dixon Aff. at 1, Pl.'s Exh. A).

In view of plaintiff's deposition testimony and the subsequent affidavits of plaintiff and his treating physician, the Court believes that plaintiff has failed to establish that his PVSD or depression substantially affect his ability to perform "major life activities." In a recent Eighth Circuit decision, the plaintiff similarly alleged that depression symptoms substantially limited her major life activities, "causing a loss of sleep and appetite, and interfer[ing] with the ability to 'have intimate relations.'" *Cody v. CIGNA Healthcare of St. Louis, Inc.*, 139 F.3d 595, 596 (8th Cir. 1998). The Court, in determining the plaintiff failed to demonstrate the existence of a disability as a matter of law, was persuaded by the fact that "Cody [plaintiff] was always able to work ... and she is unable to point to a single occasion when her depression impeded her work performance."

In the present case, neither plaintiff, nor his treating physician, have demonstrated how this "lack of sleep" has interfered with plaintiff's ability to sustain gainful employment. In fact, plaintiff testified to the contrary that his symptoms did not interfere with his ability to perform his job. In short, the Court does not believe that plaintiff has shown how his "loss of sleep" equates with interference with a major life activity as defined by 29 C.F.R. § 1630.2(i). Accordingly, the Court concludes that plaintiff has failed to establish that he has an impairment which substantially limits a major life activity.

 This does not end the Court's analysis, however, as plaintiff alternatively claims that his employer regarded him as disabled. There are essentially three ways in which a plaintiff can illustrate that an employer regarded the plaintiff as disabled:

(1) the individual may have an impairment which is not substantially limiting but is perceived by the employer as a substantially limiting impairment; (2) the individual may have an impairment which is only substantially limiting because of the atti-

tudes of others toward the impairment; or (3) the individual may have no impairments at all but is regarded by the employer as having a substantially limiting impairment.

*Walker v. Consolidated Biscuit*, No. 96–3747, 1997 WL 359054 *3 (6th Cir. June 26, 1997) (quoting 29 C.F.R. § 1630.2(1)). The proper test for determining whether a perceived impairment substantially limits a major life activity is " 'whether the impairment, as perceived, would affect the individual's ability to find work across the spectrum of same or similar jobs.'" *E.E.O.C. v. The Chrysler Corp.*, 917 F.Supp. 1164, 1168 (E.D.Mich. 1996) (quoting *Partlow v. Runyon*, 826 F.Supp. 40, 44 (D.N.H.1993)).

Plaintiff contends that defendant treated plaintiff as though he had a substantially limiting impairment. In support of his contention, plaintiff argues that defendant actively "encouraged" him to take a medical leave of absence. Further, plaintiff states that he was treated as though he was a "threat" to other employees of defendant. Finally, defendant contends that Inson's notes, taken in June of 1996, depicting plaintiff as "delusional" "erratic" and "dysfunctional" are also demonstrative of defendant's perceived regard for him as disabled. Defendant responds that plaintiff "has no evidence to establish that anyone at Polk perceived him as having a qualified disability." (Df.'s S.J. at 13). Defendant, while not disputing its awareness of plaintiff's difficulties, states that it merely "offered" plaintiff the opportunity to take time off and there is nothing improper or illegal about offering plaintiff an "accommodation." Further, defendant states that plaintiff could have declined defendant's offer and his job would have remained available. Finally, defendant notes that after plaintiff's termination, the company checked for other positions within the company in which plaintiff could be placed and requested that plaintiff remain in touch in the event of an opening.

Plaintiff's primary evidence in support of his contention that defendant perceived him as disabled are Inson's notes that depict

---

**3.** Ms Dixon avers that she has treated plaintiff since July 29, 1996 for "major depression and

post-traumatic stress disorder." (Dixon Aff. at 1, Pl.'s Resp. at Exh A).

plaintiff as "delusional," "erratic," and "dysfunctional," and the company's decision to offer plaintiff a paid medical leave of absence. On this issue, defendant cites the Sixth Circuit's recent decision in *Kocsis v. Multi–Care Management, Inc.* 97 F.3d 876 (6th Cir.1996) wherein the court granted defendant's motion for summary judgment on the basis that plaintiff could not establish that she had a disability. The plaintiff in Kocsis argued that the defendant employer perceived her as disabled because it knew that she was having health problems and noted that these health problems were affecting her job performance. In finding plaintiff's argument unavailing, the Court stated, "While the defendant may have perceived that Kocsis' health problems were adversely affecting her job performance, there is no evidence that defendant regarded Kocsis as being unable to care for herself or to perform all of the duties of her job." *Kocsis,* 97 F.3d at 885.

The Court believes that the *Kocsis* case is instructive by analogy as the Court believes that the evidence in this case while demonstrating defendant's awareness of plaintiff's difficulties on the job, is insufficient to demonstrate that defendant regarded plaintiff as disabled. Plaintiff testified that no one at defendant ever told him that they regarded him as disabled, nor did plaintiff ever inform anyone at defendant that he was experiencing difficulty performing his job. (Kvintus Dep. at 842–844).

Instead, plaintiff argues that defendant's perception of disability should be inferred from defendant's offer to plaintiff of a paid medical disability leave. The Eighth Circuit's decision in *Cody, supra,* is precisely on point and offers guidance on this very issue. In *Cody,* the plaintiff argued that the defendant perceived her as disabled because the defendant "offer[ed] her paid medical leave and requir[ed] that she see a psychologist before returning to work." *Cody,* 139 F.3d 595, 597. The Court rejecting Cody's argument, stated:

> An employer's request for a mental evaluation is not inappropriate if it is not obvious that an employee suffers from a disability. A request for an evaluation is not equivalent to treatment of the employee as

though she were substantially impaired. Employers need to be able to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims under §§ 12112(a) and 12102(2)(C). (citations omitted).

*Id.* Further, the Court also rejected plaintiff's implication that her supervisor's awareness of coworker complaints about her allegedly "unusual behavior" inferred the supervisor's regard for her as disabled, stating, "Schultz's [supervisor's] mere knowledge of behavior that could be associated with an impairment does not show that Cigna treated Cody as if she were disabled." *Id.* Analogously, the Court does not believe that Inson's offer to plaintiff of a paid medical leave infers that the company perceived plaintiff as disabled. To hold otherwise would unnecessarily inhibit employers from any inquiry regarding the status of behavior on the part of an employee that an employer may perceive as inappropriate for the employment environment.

■ Additionally, plaintiff makes much ado about Inson's notes compiled shortly after plaintiff's exchange with Ann Feidor over scheduling conflicts contending that these notes conclusively establish that defendant regarded plaintiff as disabled. The Court notes that these "impressions" were compiled by Inson in response to Lesinski's inquiry regarding the potential for offering plaintiff some time off. The impressions recorded in the notes are properly attributable to Lesinski, Buddenborg, and Feidor, and are not necessarily the perceptions of Inson, the individual responsible for the termination decision. (Inson Dep. at 106). Plaintiff has not provided any evidence from which the Court could conclude that Inson regarded the plaintiff as disabled. In fact, the evidence is uncontroverted that while Inson offered plaintiff time off for medical leave, plaintiff was free to decline such an offer and return to his job. (Inson Dep. at 113; Lesinski Dep. at 71).

Moreover, plaintiff must establish that the disability that defendant allegedly perceived him as having would "affect his ability to find jobs across the spectrum of same or similar jobs." The evidence establishes that at the

time of plaintiff's termination in December of 1996, defendant regarded the plaintiff as capable of performing the same or similar jobs. Prior to plaintiff's termination, Inson testified that he searched the company for a position that would match plaintiff's skill level in hopes of retaining him at the company. (Inson Dep. at 142–144). In a recent disability discrimination case, the Fifth Circuit found dispositive on the issue of whether the company regarded the plaintiff as disabled, the company's attempt to place an individual in other positions prior to termination. *Sherrod v. American Airlines, Inc.,* 132 F.3d 1112 (5th Cir.1998). On the issue of the company's regard for plaintiff's disability, the court stated, "There is undisputed evidence which shows that American attempted to place [plaintiff] in other positions for which American did not deem [plaintiff] disqualified due to her back condition. Such evidence could only permit a reasonable jury to conclude that American believed Sherrod to be qualified for another position." *Id.* at 1121. Besides attempting to secure employment for plaintiff within the company, defendant offered plaintiff out placement services and requested that plaintiff keep in contact in case further positions within defendant became available. (Inson Dep. at 142–143). The Court does not believe that these actions on the part of defendant comport with a finding that defendant perceived the plaintiff as disabled.

Finally, plaintiff must also establish the fifth element of a prima facie case under *Monette, supra,* which requires a showing that the company either kept the position open while soliciting other applications or that plaintiff's position was filled. Plaintiff maintains that defendant left the position open; therefore, plaintiff concludes that he has established this element of his prima facie case. Defendant contends that the position did not remain open; rather, defendant contends that it was eliminated commensurate with plaintiff's termination in December, 1996. Defendant has provided to the Court a copy of its organizational chart which corroborates Feidor's testimony that the position was eliminated and that plaintiff was not replaced. (Feidor Dep. at 34–35; Df.'s Mot. S.J.Exh. 25). As of October 28, 1997, the Ford team was comprised of approximately four members, with two SSDs, and Feidor retaining the position as team manager. Plaintiff has not provided the Court with any evidence to controvert the testimony of Feidor, nor any evidence on which the Court could conclude that the position has remained open while defendant solicited applications or that the plaintiff was replaced. Accordingly, the Court finds that plaintiff has failed to establish the disability element of his prima facie claim for disability.

### Plaintiff's Breach of Contract Claim

■ In Count II of plaintiff's First Amended Complaint, plaintiff alleges that defendant's management employees "promised plaintiff that plaintiff would not be discharged from defendant's employment while he was on a leave mandated by his employer." (Pl.'s First Amend. Comp. at 4). Plaintiff alleges that he relied on these "promises" and upon his return from medical leave in December of 1996, plaintiff states that he was terminated in violation of this "agreement." Defendant responds that plaintiff's acceptance of the position of SSD was memorialized in a letter from Paul Inson which expressly stated that plaintiff's employment with defendant was "at-will." (Df.'s Mot. S.J.Exh. 16–17). Further, defendant disputes that such language was ever utilized by Lesinski and Inson, and points out that both individuals have provided testimony indicating that they did not make promises of that nature to the plaintiff. (Inson Dep. at 123; Lesinski Dep. at 104).

■ Plaintiff predicates his claim of just cause employment upon certain conversations that plaintiff states that he had with Mike Lesinski and Paul Inson before agreeing to the medical leave which was to commence in July of 1996. In his one sentence argument in support of his claim, plaintiff while acknowledging his at-will employment status, states that "the terms of the contractual relationship changed when a Director of Human Resources, Paul Inson, and the Project Manager, Lesinski, repeatedly told him his job was secure." (Pl.'s Resp. at 33). Employment contracts for an indefinite duration are presumptively terminable at the will

of either party for any reason or for no reason at all. *Lynas v. Maxwell Farms,* 279 Mich. 684, 687, 273 N.W. 315 (1937). However, the presumption is not "a substantive limitation on the enforceability of employment contracts but merely a rule of construction." *Toussaint v. Blue Cross & Blue Shield of Michigan,* 408 Mich. 579, 597, 292 N.W.2d 880 (1980).

■ In order to overcome the presumption of employment at will, a party must present sufficient proof of either a contractual provision for a definite term of employment or a provision forbidding discharge absent just cause, or it may be overcome by proofs which permit a promise implied in fact of employment security. *Rowe v. Montgomery Ward & Co.,* 437 Mich. 627, 636–637, 473 N.W.2d 268 (1991). In deciding whether there was mutual assent to a just-cause provision, the Court employs an objective test "looking to the expressed words of the parties and their visible acts." *Id.* at 640, 473 N.W.2d 268 quoting *Goldman v. Century Ins. Co.,* 354 Mich. 528, 535, 93 N.W.2d 240 (1958) This Court has previously stated that any orally grounded contractual obligation for permanent employment "must be based on more than an expression of optimistic hope of a long relationship." *Carpenter v. American Excelsior Co.,* 650 F.Supp. 933, 936, n. 6 (E.D.Mich.1987). Therefore, in order to defeat a motion for summary judgment, plaintiff must show that more than a mere subjective expectancy existed that he would be terminated only for just cause. *Reid v. Sears, Roebuck & Co.,* 790 F.2d 453 (6th Cir.1986).

In the instant case, plaintiff contends that before his July of 1996 medical leave commenced defendant's employees Inson and Lesinski repeatedly told him "that I would have a job when I came back to work." (Kvintus Dep. at 27–28). In his deposition, plaintiff stated that he did not believe he was an employee at will because "Paul had said, and Mike has said . . . they told me to take time off; you don't have to worry about it." (Kvintus Dep. at 22). Aside from the aforementioned statements, plaintiff does not offer any other evidence demonstrative of any actions undertaken by defendants which would lead plaintiff to the conclusion that his employment was not terminable at will. The plaintiff has presented no evidence on which the Court could conclude that an objective meeting of the minds between plaintiff and defendant occurred on the issue of just-cause employment.

Further, plaintiff completely ignores the significance of the provision for employment at-will endorsed by the plaintiff on his acceptance of defendant's employment offer for the position of SSD. Viewing the evidence in the light most favorable to plaintiff, even if defendant's employees did communicate to plaintiff that he would be reinstated to his position upon his return from medical leave, defendant's promise cannot be construed as anything more than a promise to return plaintiff to an at-will position. In *Smith v. F.W. Morse & Co., Inc.,* the First Circuit held that "A contract to reinstate an at-will employee to an at-will position (from which she could immediately be removed without cause) is no contract at all." 76 F.3d 413, 426 (1st Cir.1996). The employment offer signed by plaintiff unequivocally provides for employment-at-will and was signed by the plaintiff upon his acceptance of the SSD position. Accordingly, the Court finds that plaintiff's claim for breach of just-cause contract for employment is without merit.

### Conclusion

For the reasons presented above, the Court concludes that defendant is entitled to an entry of summary judgment on all of the claims presented.

Accordingly;

**IT IS ORDERED** that defendant's motion for summary judgment is **GRANTED.**