EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,
Plaintiff,

v.

BLUE CROSS BLUE SHIELD OF
CONNECTICUT, Defendant.

No. 3:97CV0890 GLG.

United States District Court,
D. Connecticut.

Dec. 21, 1998.

Deborah Reik, Trial Attorney, James L. Lee, Regional Attorney, Anna M. Stathis, Supervisory Trial Attorney, Equal Employment Opportunity Commission, New York, NY, for Plaintiff.

Paul S. Tagatac,Maureen Danehy Cox, Carmody & Torrance, Waterbury, CT, for Defendant.

## OPINION

GOETTEL, District Judge.

The Equal Employment Opportunity Commission ("EEOC") has filed suit alleging that Blue Cross Blue Shield of Connecticut ("Blue Cross") violated Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(a), when it rescinded an offer of employment to a job applicant on the basis of a perceived disability, after receiving a report of his pre-employment physical. Subsequent medical tests by the applicant's own physician revealed that his condition was something other than that suspected by the

employer and was less of an immediate health threat. The EEOC has now moved for partial summary judgment on the ground that the employer's rescission of the job offer discriminated against the applicant in violation of the ADA. Blue Cross has responded that the applicant was not medically qualified for the job at the time the offer was rescinded, and has cross-moved for summary judgment on this ground, as well as statute of limitations grounds.

After due consideration of the moving papers and supporting materials and after oral argument, this Court denies both motions for summary judgment. For the reasons discussed more fully below, the Court finds that this action was timely filed and, thus, denies Blue Cross' motion for summary judgment on limitations grounds. As to whether Blue Cross violated the ADA in rescinding the offer of employment on the basis of the applicant's perceived disability, the Court finds genuine issues of material fact that preclude granting summary judgment to either party. Accordingly, this Court denies the cross-motions for summary judgment.

## FACTS

In September or October, 1993,[1] Mario Pannone, the Charging Party, applied for a position as a Dishwasher I [2] with Blue Cross. At the time, Mr. Pannone was working in the kitchen at a Roy Rogers restaurant and was unaware that he was suffering from any type of kidney disease. He was interviewed by Paul Caron, the Cafeteria Manager at Blue Cross, who spent approximately thirty minutes with Mr. Pannone and his wife, showing them the kitchen and describing what the job entailed. (D. Pannone Dep. at 43). Mr. Caron was pleased with Mr. Pannone's work experience and found him qualified for the job. (Caron Dep. at 21, 22). Mr. Caron

---

1. Many of the dates relating to Mr. Pannone's application and offer of employment are in dispute since Blue Cross did not retain any records concerning his application.

2. In general terms, the job duties and responsibilities of a Dishwasher I in 1993 were: to scrape plates and silverware and stack and load items in to the dishwasher; to set up the dishwashing machine with soap and water; to wash

utensils, pots, pans, trays, etc.; to wash the cafeteria walls, sink and counter surfaces; to clean, sweep, and mop the floor; to take out the trash; to clean and place rubber mats on the floor; and to set up eating utensils and dishes for various meals. (Caron Dep. at 16–18). Mr. Caron testified that a dishwasher would be required to lift items of approximately 40 pounds. Id. at 21.

offered Mr. Pannone the position subject to a pre-employment physical examination, which Mr. Caron indicated was for the purpose of determining if Mr. Pannone had a communicable disease. Blue Cross, however, states that it required a physical of all applicants whose jobs would be physically demanding or those who would come in contact with noxious substances. (Liben Dep. at 20). A dishwasher position was one of the jobs requiring a pre-employment physical because of the heavy lifting and the degree of physical activity involved. (Liben Dep. at 22). It is undisputed, however, that Mr. Caron found Mr. Pannone to be qualified for the position and wanted to hire him, the only condition being the pre-employment physical.

Mr. Pannone then met with another Blue Cross representative, Roseanne St. John, who had him fill out a formal application, described to him the 401(k) plan and health insurance benefits, and then referred him to Community Health Care Plan ("CHCP"), a Blue Cross affiliate,[3] for his physical. (D. Pannone Dep. at 13–18).

On November 3, 1993, Mr. Pannone reported to CHCP, where he was examined by Gina Morgenstein, a physician's assistant, and had various laboratory tests performed. Ms. Morgenstein determined that Mr. Pannone's laboratory test results showed indications of kidney disease in that his BUN and creatinine levels[4] were approximately twice the normal limits, he had protein in his urine, and his hematocrit was low. Ms. Morgenstein received Mr. Pannone's laboratory results on November 4, 1993, and contacted Mr. Pannone's wife that same day, advising her of the elevated kidney functions and indicating that this was a matter of serious concern. Mrs. Pannone stated she would contact the West Haven V.A. Medical Center to arrange an immediate follow-up for her husband. This was noted in the report of Mr. Pannone's physical.

The CHCP report states under "Physician's Summary, Remarks and Diagnosis:"

Abnormal laboratory results suggestive of kidney disease. Pt. instructed that he must receive a full workup of this as this is potentially quite a serious problem.

Then, under "Physician's Recommendations" the report stated:

Pt. to obtain records from this Health Check and from North Haven Medical Center to have complete workup of abnormal lab values including kidney function.

This report was sent to Karen Civali, the Occupational Health Nurse at Blue Cross. Ms. Civali states that she was concerned about Mr. Pannone's blood pressure, as well as his lab results that showed elevated BUN and creatinine levels which "together signified some sort of kidney problem or potential kidney problem." (Civali Dep. at 11, 13, 15). She consulted with Dr. Eric Liben, a physician consultant for Blue Cross, and they decided "that the man had a problem and that he was not a good candidate for the job." *Id.* at 16. According to Ms. Civali, Dr. Liben told her not to hire Mr. Pannone until his blood pressure and renal problems were under control. *Id.* Ms. Civali testified that, in making this decision, she did not consider the position for which he was applying. "[T]here was not a question as the type of job that this man was applying for. We were looking at whether or not he passed a physical. He did not pass the physical." *Id.* at 20. "He was a sick man and his test results and his physical here showed us that there was something the matter with him and he needed to seek some sort of treatment or help." *Id.* at 17. She did indicate that, if Mr. Pannone had wanted to submit his own doc-

---

**3.** The EEOC attempts to cast doubt on the reliability of the CHCP medical report based upon the relationship between Blue Cross and CHCP. The EEOC asserts that Blue Cross had provided approximately 29 million dollars in surplus bonds to CHCP in order to prevent CHCP from going bankrupt, and Blue Cross appointed a majority of the members of the Board of Directors of CHCP. We find these arguments totally irrelevant. No one has suggested that the test results from CHCP were wrong or that CHCP had any reason to provide anything but an accurate report to Blue Cross regarding Mr. Pannone. The relationship between the two entities has no bearing on this case whatsoever.

**4.** Kidney function is measured by serum creatinine, a waste product, and blood urea nitrogen ("BUN"). *See* Robert Berkow, Mark Beers, and Andrew J. Fletcher, *The Merck Manual of Medical Information* 591 (Home Ed.1997).

tor's report or other documentation, that information would have been taken into consideration, but that she was not aware of any such documentation being submitted. *Id.* at 21.

Dr. Liben testified that, in reviewing pre-employment physicals, he always looked over the job description of the position for which the applicant was being considered. (Liben Dep. at 30). He would then review the report of the physical with a concern toward whether the applicant could perform the essential functions of the job without endangering his or her own life and whether the applicant would be a threat to the safety of others. *Id.* at 29. Dr. Liben testified regarding his review of Mr. Pannone's records:

> The two significant concerns with Mario Pannone that make this case very unique and concerning is his blood pressure of 170 over 100 and lab work, as found on the last page, in which a creatinine of 3.4 and a BUN of 46 are noted.
>
> In addition, associated concerning aspects would be a description of the fact that there had been no known kidney disease, that he appeared older than his stated age, that he was overweight, that he had bluish discoloration of his toes.
>
> Oh, and his urinalysis, which showed three plus protein and four plus blood in the urine.
>
> As well, he has a hematocrit, which is a bloodcount, of 35.7, with a normal MCV, taken together....
>
> The two issues that were of most concern to me were the two that I mentioned up front.... [A]t the time this was obtained, he had lost about half or more of his kidney function....
>
> These are findings that, at this point in time, with no other information, would lead one to be concerned about the possibility of primary hypertension.... causing damage to this man's body, the extent to which was not apparent; and because he was asked to do a job that entailed a degree of lifting and activity, not a sedentary job, this man may have been ... subjecting himself to

danger because of the associated problems he may have had with other body organs, such and his heart and his blood vessels....

> So to have this man go out unrestricted with a blood pressure at this range and the concern that he had damage to his kidneys coming from his high blood pressure, would not have been correct.

*Id.* at 41–45. Dr. Liben then described other abnormalities that appeared in Mr. Pannone's test results, including blood in his urine, anemia, elevated uric acid, which further substantiated his concern that the hypertension had damaged his kidneys and was potentially damaging his other vital organs. *Id.* at 45–46. Dr. Liben was very careful to point out that he could not make a definitive diagnosis based upon the information which he had before him and that there were a number of other possible diagnoses to consider. *Id.* at 48.

In the meantime, as a result of the call from CHCP, which Mrs. Pannone recalls in far more alarming detail than Ms. Morgenstein, Mrs. Pannone immediately took her husband to the V.A. Hospital emergency room, where a variety of tests were performed and he was referred to Dr. Kevin McConnell, a kidney specialist. Over the next two weeks, additional tests, including an ultrasound, were performed. On November 18, 1993, Mr. Pannone saw Dr. McConnell, who diagnosed Mr. Pannone with polycystic kidney disease.[5] (McConnell Dep. at 6). Dr. McConnell also treated Mr. Pannone for hypertension for a period of several weeks.

Dr. McConnell testified that because polycystic kidney disease is a "chronic condition as opposed to one which is going to be an acute and abrupt change in his renal function," Mr. Pannone was employable for certain jobs depending on the kind of work he would be doing. *Id.* at 27. Dr. McConnell was of the opinion in 1993 that Mr. Pannone would be able to perform the duties of a

---

5. Polycystic kidney disease is a hereditary disorder in which cysts form in both kidneys. The cysts gradually enlarge, destroying some or most of the normal tissue in the kidneys. Berkow, *supra* note 4, at 618.

dishwasher at Blue Cross.[6] The parties dispute, however, whether this information was ever communicated to Blue Cross.

The EEOC claims that at some point between November 18th and December 15th, Dr. McConnell wrote a note to Blue Cross indicating that Mr. Pannone was "fully employable" and, at that point, Blue Cross had a duty to hire Mr. Pannone. Assuming a note was ever written, it apparently no longer exists, and Blue Cross denies ever having received this note. Additionally, Blue Cross no longer has a file on Mr. Pannone.[7] The only records that Dr. McConnell has relating to a note being written are on his computer under "Correspondence" with the name "Pannone," which the doctor testified meant that "at some point I must have written something for him." *Id.* at 33. He does not recall what this correspondence was and he does not recall documenting that Mr. Pannone was fully employable. *Id.* at 44.

It is clear that Dr. Liben's evaluation of Mr. Pannone's pre-employment physical was based solely upon the records supplied to him by Blue Cross and without the benefit of the subsequent diagnosis of polycystic kidney disease or any records from the V.A., despite the indication in the report that the patient was going for additional tests. Dr. Liben admitted that had he been aware of the diagnosis of polycystic kidney disease, this would have changed his assessment. As Dr. Liben explained, this diagnosis, made with the benefit of a renal ultrasound that showed multiple cysts in both kidneys, carried a "positive significance." *Id.* at 58. To paraphrase his explanation of the significance,

even though polycystic disease can be quite destructive of the kidney in that the cysts continue to enlarge and renal failure usually supervenes after a number of years, it is not associated with the problems described above that could result from hypertension, and it does not carry with it the same risks upon exercise. *Id.* at 58–59. Dr. Liben admitted that if he had known at the time that Mr. Pannone had polycystic disease, "it would have changed the way we looked at the case... [I]f Mr. Pannone had presented with known polycystic kidney disease at the time that we knew him, had been under the care of a physician and had blood pressure that was under control and he was going to be followed by his physicians, I'd have absolutely no reason not to take him, but those things were obviously not known to me at the time." *Id.* at 59.

Dr. Liben testified that he did not consider Mr. Pannone a risk to other employees besides himself. *Id.* at 68. He also did not consider the fact that Mr. Pannone was already working at Roy Rogers to be material, since "if he were in danger, then I could not continue that danger." *Id.*

The parties dispute when the job offer to Mr. Pannone was rescinded by Blue Cross. Blue Cross contends that it occurred on or about November 15, 1993. The EEOC contends that it occurred between November 6th and 16th, although according to the deposition testimony of Mrs. Pannone, it was not until sometime in December.

Mrs. Pannone testified that in mid-November, she called Roseanne St. John at Blue Cross to find out the status of her husband's

---

6. From the excerpts of Dr. McConnell's deposition that we have before us, it does not appear that he had a job description for the position of Dishwasher I before him. He described the dishwasher position as bussing tables, putting dishes in an automated dishwasher, stacking the dishes afterwards, and scraping food off of the plates. (McConnell Dep. at 27).

7. On November 10, 1994, in response to a request from the EEOC for its file on Mario Pannone, Blue Cross responded that it had no records on Mario Pannone. The EEOC contends that, because Blue Cross failed to maintain its records on Mr. Pannone for at least one year in accordance with EEOC regulations, 29 C.F.R. § 1602.14, and in accordance with its own rec-

ord retention policy, a negative inference should be drawn against Blue Cross. We do not know when these records were destroyed. However, Blue Cross was not served with a notice of charge until November 3, 1994. Therefore, it is unlikely that this file was destroyed after it received notice of the charge. We do agree, however, that these records should have been retained for at least a year after the decision was made not to hire Mr. Pannone. *See* 29 C.F.R. § 1602.14. However, even if we were to draw a "negative inference" against Blue Cross to the effect that it received a letter from Dr. McConnell, there still remain disputed issues of fact regarding when this letter was received and the contents of the letter.

job. She was told initially that the physical had indicated there was a problem with his kidneys and that they did not know whether her husband was going to get the job. (D. Pannone Dep. at 24). Mrs. Pannone called back several days later and was then told that Dr. Liben was going to review the results. *Id.* at 25. She told Blue Cross that her husband was able to work and that he was going to the V.A. hospital, and Dr. McConnell could supply Blue Cross with a letter to the effect that her husband was one hundred per cent employable. *Id.* Mrs. Pannone further testified that she spoke with Dr. McConnell who told her that he had sent a facsimile to Ms. St. John regarding Mr. Pannone. *Id.* at 27. Mrs. Pannone states that in the beginning of December she called Blue Cross and spoke with Ms. St. John again, who told her that she had received Dr. McConnell's letter but that the position had been filled by another person and that the job was no longer available. *Id.* at 26.

Mr. Pannone remained at his then current job at Roy Rogers until May 3, 1994. Eventually, Mr. Pannone did experience renal failure and since January 1996 has been on kidney dialysis.

On or about November 15, 1993, Blue Cross announced a company-wide reduction in force. It is unclear from the record what impact this had on the job Mr. Pannone had applied for. However, it* is clear from the record that this reduction in force was not the reason that Mr. Pannone was not hired. Indeed, the job was offered to someone else.

On July 14, 1994, Mr. Pannone filed a charge of discrimination with the Connecticut Commission on Human Rights and Opportunities ("CHRO"), which was received by the EEOC on July 18, 1994, stating that he believed he had been discriminated against on the basis of his physical disability, kidney disease, when Blue Cross withdrew its offer of employment to him. This charge was returned to Pannone for refiling, because it was considered an "imperfect charge" in that it indicated on the face of the charge the nature of his alleged disability. Blue Cross did not receive notice of the charge until November 3, 1994. A corrected charge, setting forth the same essential allegations as the original charge, was filed on December 19, 1994. On May 9, 1997, the EEOC instituted the instant action.

## DISCUSSION

### Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions ... together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). This Court's function is to determine if there exists a genuine issue of material fact to be tried rather than to resolve disputed issues of fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party seeking summary judgment bears the burden of showing that no genuine factual dispute exists. *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 202 (2d Cir.1995). The substantive law governing the case identifies those facts that are material on a motion for summary judgment. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Once the moving party has made a showing that there are no genuine issues of fact to be tried, then the burden shifts to the nonmoving party to raise triable issues of fact. *Id.* at 256, 106 S.Ct. 2505. Mere conclusory allegations will not suffice. Instead, the nonmoving party must present "sufficient probative evidence" to show that there is a factual dispute. Fed.R.Civ.P. 59(e).

In considering a motion for summary judgment, this Court is required to view the evidence in the light most favorable to the non-moving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. This is true even though the Court is presented with cross-motions for summary judgment. *Barhold v. Rodriguez,* 863 F.2d 233, 236 (2d Cir.1988). The movant's burden does not shift when cross-motions for summary judgment are before the Court. Rather, each motion must be judged on its own merits. *See Association of Int'l Auto. Mfrs., Inc. v. Abrams,* 84 F.3d 602, 611 (2d

Cir.1996). Thus, neither party may be entitled to summary judgment even though cross-motions for summary judgment have been filed. *See Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993); *A.W. v. Marlborough Co.,* No. 3:96CV2135(AHN), 1998 WL 737875, at *1 (D.Conn. Sept. 9, 1998).

We begin by considering the limitations issues raised by Blue Cross, since our disposition of these issues could dispose of the entire case.

### I. *Was the Charge Timely Filed?*

■ Relying on the date the amended charge was filed, Blue Cross argues initially that Mr. Pannone's charge of discrimination was not timely filed with the EEOC. It is undisputed that a charge of discrimination under Title I of the ADA must be "filed" with the EEOC within 300 days of the alleged discriminatory act. Title I of the ADA, which governs employment discrimination claims, is enforced pursuant to the "powers, remedies, and procedures set forth in section 2000e–5," 42 U.S.C. § 12117(a), which in a deferral state such as Connecticut requires a charge of discrimination to be filed within 300 days of the discriminatory act. 42 U.S.C. § 2000e–5(e)(1); *see Halas v. Ford Motor Co.,* 987 F.Supp. 227, 229 (W.D.N.Y. 1997).

Although the exact date that Blue Cross rescinded Mr. Pannone's job offer is disputed, the evidence of record indicates that it occurred no earlier than mid-November 1993, and no later than mid-December 1993. In either event, Mr. Pannone's initial charge filed on July 18, 1994, would have been timely.

Blue Cross argues, however, that this charge should not be considered because it was an "imperfect" charge—i.e., it was returned to Mr. Pannone for refiling because of a defect on the face of the charge—and it was not served upon Blue Cross within ten days of the date it was filed, as required by statute.[8] 42 U.S.C. § 2000e–5(e)(1). Thus, Blue Cross relies on the filing date of the second or amended charge, of December 19, 1994, which under either scenario would be untimely.

Although Title VII requires notice of the charge be given to the person against whom the charge is made within ten days,[9] 42 U.S.C. § 2000e–5(e)(1), the procedures found in Title VII are not intended to be "a stumbling block to the accomplishment of the statutory objectives." *Hammer v. Hillsborough County,* 927 F.Supp. 1540, 1543 (M.D.Fla.1996). Thus, courts have held that a delay between the filing of a charge of discrimination and notice to the employer does not render the charge untimely. *See, e.g., Washington v. T.G. & Y. Stores Co.,* 324 F.Supp. 849 (W.D.La.1971) (delay of 141 days was not *per se* unreasonable); *EEOC v. Raymond Metal Prods. Co.,* 385 F.Supp. 907, 913 (D.Md.1974), *aff'd in part and rev'd in part on other grounds,* 530 F.2d 590 (4th Cir.1976) (holding that a charge was not barred as untimely notwithstanding the fact that the amended charge was not served upon the respondent until after the limitations period had expired). In *Washington, supra,* the court held that a charging party should not be prejudiced by the EEOC's failure to effect prompt service on the respondent, when that in no way was under his or her control. 324 F.Supp. at 854.

---

8. The parties have agreed for purposes of these motions that Blue Cross received notice of the initial charge on November 3, 1994. The testimony of the EEOC investigator assigned to this matter, Susan Buscemi, would seem to point to an earlier date. She testified that when she reviewed the charge and determined that it needed to be refiled, it appeared that a notice of charge had already been sent to Blue Cross because a charge number had been assigned to the charge. (Buscemi Dep. at 71). However, since the parties have agreed to the date of November 3, 1994, we will use that date.

9. The regulations provide:

Within ten days after the filing of a charge in the appropriate Commission office, the Commission shall serve respondent [with] a copy of the charge, by mail or in person, except when it is determined that providing a copy of the charge would impede the law enforcement functions of the Commission. Where a copy of the charge is not provided, the respondent will be served with a notice of the charge within ten days after the filing of the charge....

29 C.F.R. § 1601.14(a).

Moreover, in this case, the second or amended charge set forth the same allegations of discrimination as the original charge, and thus related back in time to the filing of the initial charge. The EEOC regulations provide that "[a] charge may be amended to cure technical defects or omissions.... Such amendments ... will relate back to the date the charge was first received." 29 C.F.R. § 1601.12(b); *see Washington v. Kroger Co.,* 671 F.2d 1072, 1076 (8th Cir.1982). In this case, the original charge was prepared by plaintiff, a layman, presumably inexperienced in the ADA filing requirements. The amended charge was filed solely for purposes of curing a technical defect and, thus, we find that it related back to the filing of the original charge.

The Second Circuit has liberally interpreted the filing requirements of Title VII and adopted what it termed a "flexible stance in interpreting Title VII's procedural provisions." *Egelston v. State Univ. College,* 535 F.2d 752, 754 (2d Cir.1976) (observing that Title VII is "rife with procedural requirements which are sufficiently labyrinthine to baffle the most experienced lawyer, yet its enforcement mechanisms are usually triggered by laymen"). The purpose of the administrative filing requirements in Title VII is to provide the EEOC with an opportunity to investigate a charge and attempt a resolution of the controversy through conciliation before permitting the charging party to pursue a lawsuit. *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 44, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). Given the liberal approach of the Second Circuit toward the fil-

ing requirements of Title VII and the fact that the second charge related back to the first filing, we hold that Mr. Pannone's charge of discrimination was timely filed with the EEOC.

## II. Was the EEOC's Complaint Timely Filed?

Blue Cross next alleges that even if the charge was timely filed, the EEOC's action is barred by the applicable state statute of limitations. This argument was rejected by the Supreme Court in *Occidental Life Insurance Co. of California v. EEOC,* 432 U.S. 355, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977), which held that EEOC enforcement actions are not subject to state statutes of limitations. Therefore, we hold that Connecticut's state statute of limitations does not bar this action brought by the EEOC.

## III. Did Blue Cross Discriminate Against the Charging Party on the Basis of a Perceived Disability?

In this case, the EEOC does not challenge Blue Cross' requiring a pre-employment physical.[10] Instead, it challenges as discriminatory the action taken by Blue Cross as a result of the test results and Mr. Pannone's perceived disability.

We agree with the EEOC that there is direct evidence in the record that Blue Cross rescinded the job offer to Mr. Pannone based upon his pre-employment medical examination test results. We give no credence to Blue Cross' argument that the rescission of Mr. Pannone's job offer was due to a reduction in force.[11] There has been no evidence

10. The ADA provides that the prohibition against discriminating against a qualified individual with a disability includes medical examinations and inquiries, 42 U.S.C. § 12112(d)(1), with certain exceptions, including:

A covered entity may require a medical examination after an offer of employment has been made to a job applicant and prior to the commencement of the employment duties of such applicant, and may condition an offer of employment on the result of such examination, if —
(A) all entering employees are subjected to such an examination regardless of disability;
(B) information obtained ... is treated as a confidential medical record [with certain exceptions] ...

(C) the results of such examination are used only in accordance with this subchapter.
42 U.S.C. § 12112(d)(3). Medical examinations required of individuals to whom a job offer has been extended need not be job-related nor justified by business necessity. *See* 29 C.F.R. pt. 1630, app. § 1630.14(b); *see also Norman-Bloodsaw v. Lawrence Berkeley Lab.,* 135 F.3d 1260, 1273 (9th Cir.1998); *Grenier v. Cyanamid Plastics, Inc.,* 70 F.3d 667, 672 (1st Cir.1995).

11. Blue Cross states in its Memorandum in Support of its Motion for Summary Judgment: "The Company rescinded its conditional offer of employment because of a company-wide reduction in force that eliminated the position in question." (Def.'s Mem. at 1). As discussed above, their own witnesses testified that the offer was re-

offered in support of this assertion and the evidence in the record directly contradicts this defense.

The EEOC argues that this decision was based upon speculation that Pannone was seriously ill and that it would be dangerous for him to work at Blue Cross as a dishwasher. (EEOC Memo. in Support of Motion for Summary Judgment at 2). The EEOC correctly points out that Blue Cross did not make a definitive diagnosis based upon the CHCP report. However, the report did indicate a serious problem both in terms of Mr. Pannone's blood pressure and his kidney function. In layman's terms, it appears that the medical picture presented by test results was a "chicken and egg" proposition of sorts—*i.e.*, whether the hypertension was so severe that it was causing his other organs, such as his kidneys, to fail, in which event he was at a very high risk for a heart attack or stroke or other life-threatening condition if he engaged in physically stressful work; or, as it turned out, whether he had chronic kidney problems that were contributing to his hypertension, and which would not be affected (or at least not to the same degree) by a physically stressful job. Dr. Liben and Ms. Civali assumed the former, erring on the side of caution. Dr. Liben admits that if he had been aware of the correct diagnosis, it would have affected his recommendation regarding Mr. Pannone's employability.

■ The ADA prohibits an employer from discriminating against a qualified individual with respect to hiring because of a real or perceived disability:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). In order to survive a motion for summary judgment on a discrimination claim under the ADA, a plaintiff must establish a *prima facie* case by producing sufficient evidence to support an inference of discrimination. *See Wernick v. Federal Reserve Bank of New York,* 91 F.3d 379, 383 (2d Cir.1996); *Ryan v. Grae & Rybicki, P.C.,* No. 96 CV.3731, 1996 WL 680256, at *3 (E.D.N.Y. Nov.13, 1996), *aff'd,* 135 F.3d 867 (2d Cir. 1998). Specifically, the plaintiff must show that: (1) he is a disabled person under the ADA; (2) he is otherwise qualified to perform the job; and (3) he suffered adverse employment action because of his disability. *See Heilweil v. Mt. Sinai Hosp.,* 32 F.3d 718, 721–22 (2d Cir.1994), *cert. denied,* 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995) (decided under the Rehabilitation Act); *see also Rizzo v. Children's World Learning Ctrs., Inc.,* 84 F.3d 758, 762 (5th Cir.1996). This *prima facie* burden has been met by the EEOC, which steps into the shoes of the Charging Party.

### A. EEOC's Prima Facie Case

"Disability" is defined by the ADA as: (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(2). The EEOC relies on the third alternative under the definition of "disabled," that Mr. Pannone was regarded by Blue Cross as having a physical impairment that substantially limited one or more of his major life activities. 42 U.S.C. § 12112(a); 29 C.F.R. § 1630.2(1);[12] *see Ryan,* 1996 WL

---

scinded because Mr. Pannone did not pass the physical. No sworn affidavit or deposition testimony has been offered in support of the assertion that the job was rescinded because of a reduction in force.

**12.** The Regulations elaborate upon the ADA's definition of disability as follows:
> *Is regarded as having such an impairment* means:
> (1) Has a physical or mental impairment that does not substantially limit a major life activity but is treated by a covered entity as constituting such limitation;
> (2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment;
> (3) Has none of the impairments defined [by the EEOC regulations] but is treated by a covered entity as having a substantially limiting impairment.

680256, at *5; *Francis v.. City of Meriden,* 129 F.3d 281, 284–85 (2d Cir.1997) (holding that whether an individual is "regarded as" disabled turns on the employer's perception of the employee, a question of intent); *Hamm v. Runyon,* 51 F.3d 721, 724 (7th Cir.1995) ("We must therefore determine whether [the employer] knew about [the plaintiff's] arthritis and, if so, whether he thought it had substantially affected [the plaintiff's] ability to walk").

█ In this case, the major life activity is Mr. Pannone's ability to work.[13] With respect to the major life activity of working, the term "substantially limits" is defined as "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs...." 29 C.F.R. § 1630.2(j)(3)(i); *see Reeves v. Johnson Controls World Servs., Inc.,* 140 F.3d 144, 154 (2d Cir.1998); *EEOC v. Chrysler Corp.,* 917 F.Supp. 1164, 1169 (E.D.Mich.1996), *appeal pending.* The Second Circuit has interpreted this to mean foreclosure of a wide range of employment options within the employee's field and foreclosure generally of the type of employment involved. *Heilweil,* 32 F.3d at 724; *Dipol v. New York City Transit Auth.,* 999 F.Supp. 309, 314 (E.D.N.Y.1998).

Ms. Civali testified that, in making the decision not to hire Mr. Pannone, she did not consider the position for which he was applying. "[T]here was not a question as the type of job that this man was applying for. We were looking at whether or not he passed a physical. He did not pass the physical." (Civali Dep. at 20). "He was a sick man and his test results and his physical here showed us that there was something the matter with him and he needed to seek some sort of treatment or help." *Id.* at 17. Additionally, it is clear from Dr. Liben's testimony that his concern for Mr. Pannone's health related not only to the Dishwasher I job, but to any job involving any degree of physical exertion. Clearly, Blue Cross considered Mr. Pannone to be ineligible for employment generally. *See Venclauskas v. Connecticut Dep't of Public Safety,* 921 F.Supp. 78, 82 (D.Conn.1995) (holding that in order to fall within the "regarded as" definition, the plaintiff must prove that the defendant considered the plaintiff's impairment to foreclose not simply a particular job, but the type of employment involved generally). Thus, the Court finds that Mr. Pannone was regarded by Blue Cross as *possibly* suffering from a disability, and that Blue Cross would not offer employment to him pending a determination as to the cause of the adverse symptoms.

With respect to the other prongs of the EEOC's *prima facie* burden, it is undisputed that Mr. Pannone was considered otherwise qualified for the position, for he was offered the job subject to the pre-employment physical. He had been performing similar type work for another employer and returned to that job when the offer from Blue Cross was withdrawn. Moreover, it is undisputed that he suffered an adverse employment action. Thus, we find that the EEOC has carried its *prima facie* burden of proving that Blue Cross rescinded Mr. Pannone's offer of employment because of a perceived disability.

### B. Blue Cross' Defense

Once a plaintiff satisfies his initial burden of production and persuasion, in cases where there is direct evidence that the employer considered the plaintiff's disability in its decision, the burden shifts to the employer "to rebut the inference that the handicap was improperly considered by demonstrating that it was relevant to the job qualifications." *Dipol,* 999 F.Supp. at 313 (citing *Teahan v. Metro–North Commuter Railroad Co.,* 951 F.2d 511, 515 (2d Cir.1991), *cert. denied,* 506 U.S. 815, 113 S.Ct. 54, 121 L.Ed.2d 24

29 C.F.R. § 1630.2(1). *See also* 29 C.F.R. pt. 1630, app. § 1630.2(1), which gives as an example of a perceived disability:

[S]uppose an employee has controlled high blood pressure that is not substantially limiting. If an employer reassigns the individual to less strenuous work because of *unsubstantiated* fears that the individual will suffer a heart attack if he or she continues to perform strenuous work, the employer would be regarding the individual as disabled. (Emphasis added).

13. "Major life activities" is defined by the regulations to include functions such as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

(1992)); *see* 42 U.S.C. § 12112(b)(6). In other words, Blue Cross bears the burden of proving that, although it relied upon Mr. Pannone's disability in withdrawing his offer of employment, it was a permissible and appropriate factor to consider with respect to his qualifications ·under the circumstances. *Id.* The ultimate burden, of course, rests with Mr. Pannone to prove that despite his handicap he is qualified. *Teahan,* 951 F.2d at 515.

Blue Cross maintains that Mr. Pannone's condition was relevant to his qualifications for the job of Dishwasher I because of the health risk to him of performing the physically demanding activities required by that job. Dr. Liben has admitted that he did not consider him a threat to the safety of other workers, but it was his own safety, indeed his own life, with which he was concerned.

Under the ADA, "it may be a defense to a charge of discrimination … that an alleged application of qualification standards, tests, or selection criteria that screen out or tend to screen out or otherwise deny a job … to an individual with a disability, has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation," as required under the ADA. 42 U.S.C. § 12113(a); *see* 29 C.F.R. pt. 1630, app. § 1630.14(b). The statute further elaborates upon the term "qualification standards," stating that they may include "a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. § 12113(b). The term "direct threat" is defined as a "significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). Although the statute itself does not speak in terms of a threat to the individual himself, the EEOC's regulations define

"direct threat" as including a "significant risk of substantial harm to the health or safety of *the individual* or others that cannot be eliminated or reduced by reasonable accommodation." [14] 29 C.F.R. § 1630.2(r); *see La Chance v. Duffy's Draft House, Inc.,* 146 F.3d 832 (11th Cir.1998) (considering whether the employee's disability was a direct threat to the employee's safety); *Serrapica v. City of New York,* 708 F.Supp. 64, 73 (S.D.N.Y.) (considering, in a Rehabilitation Act case, whether an individual was a direct threat to his own safety as well as the safety of others), *aff'd,* 888 F.2d 126 (2d Cir.1989); *but see Kohnke v. Delta Airlines, Inc.,* 932 F.Supp. 1110 (N.D.Ill.1996) (holding that the "direct threat" defense could be evaluated only in terms of threats to other ‎individuals and not with respect to the disabled person himself). The determination that an individual poses a "direct threat" must be based upon an individualized assessment of the individual's ability to safely perform the essential functions of the job. 29 C.F.R. § 1630.2(r). This assessment must be based upon a "reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." [15] *Id.* The factors to be considered are: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm. *Id.; see also EEOC v. Chrysler Corp.,* 917 F.Supp. at 1170–71.

■ Everyone agrees that Mr. Pannone's CHCP test results were grossly abnormal. Although it is clear that Dr. Liben did not make a definitive diagnosis, he did conclude on the basis of the test data available to him that Mr. Pannone could not safely perform the essential functions of the job because of potentially ‚serious health risks, including

---

14. The Second Circuit has held that "great deference" should be afforded the EEOC's interpretation of the ADA since it is charged with administering the statute. *Francis,* 129 F.3d at 284, n. 1.

15. The interpretative regulations promulgated by the EEOC also provide that where an employer rescinds a conditional job offer based upon the results of a physical examination that show that the applicant does not satisfy certain employment criteria, either the exclusionary criteria

must not screen out or tend to screen out an individual with a disability or they must be job-related and consistent with business necessity. 29 C.F.R. pt. 1630, app. § 1630.14(b). As part of the showing that an exclusionary criteria is job-related and consistent with business necessity, the employer is required to demonstrate that there is no reasonable accommodation that will enable the individual with a disability to perform the essential functions of the job. *Id.*

stroke, heart attack, or death. Dr. McConnell, with the benefit of additional test results, later made a diagnosis of polycystic kidney disease that was of less immediate concern, and indicated that, in his opinion, Mr. Pannone could perform certain jobs, including the position of dishwasher. Had Blue Cross been aware of this subsequent diagnosis, we hold that it would not have been appropriate for it to rely solely on the results from the pre-employment physical, particularly when it was aware that Mr. Pannone was to have a further evaluation performed. However, we do not read the ADA or the regulations as requiring a definitive diagnosis before an employer can act; nor do we read them as placing an affirmative burden on the employer to do follow-up testing if it has sufficient reliable information on which to form a reasonable medical judgment. The regulations require this defense to be based upon a "reasonable medical judgment" that relies upon "the most current medical knowledge and/or on the best available objective evidence." 29 C.F.R. § 1630.2(r).

It is here that we find a genuine issue of material fact on the record before us. The parties dispute whether Blue Cross had information from Dr. McConnell when it made the decision not to offer Mr. Pannone the job. First, there is a question as to when the offer was rescinded. Blue Cross maintains that it was prior to Mr. Pannone's first visit to Dr. McConnell. The EEOC has presented evidence that it was after that date.[16]

There is also a dispute as to whether the note was ever even written by Dr. McConnell and, if so, as to its exact contents. Mrs. Pannone has testified that she gave Dr. McConnell the facsimile number of Blue Cross and that Dr. McConnell had said he would fax a letter to the effect that Mr. Pannone was fully employable as a dishwasher. Mr. Pannone has testified similarly. Mrs. Pannone also testified that she told Ms. St. John that she would be providing this

information and that Ms. St. John indicated that it had been received. We do not have the benefit of Ms. St. John's testimony in this regard. Blue Cross denies ever receiving this information, although it has destroyed its file on Mr. Pannone. Dr. McConnell testified that he cannot recall having written this letter but does note that there is a file on his computer under "Correspondence" with Mr. Pannone's name.[17]

Assuming Blue Cross was not provided with this information prior to making its decision not to hire Mr. Pannone, we find that Blue Cross had sufficient reliable medical information before it from which it could conclude that Mr. Pannone's employment in a physically demanding job presented significant health risks to him, indeed potentially life and death risks, and therefore, it appropriately rescinded the offer. Dr. McConnell himself indicated that it was "acceptable . . . and prudent, to say pending further evaluation, we ought not to proceed." (McConnell Dep. at 53). Although Dr. McConnell did not agree with the method used by Dr. Liben, he conceded that to have said " '[w]ell, it's probably nothing much, go ahead and employ him' would not have been the right thing to do." *Id.* at 54. Additionally, Dr. Finkelstein, Blue Cross' expert, testified that based upon the CHCP evaluation, he "would not have approved this guy for any job, even a desk job. That wouldn't have been in this guy's best interest. What he needed to do was to get himself evaluated quickly." (Finkelstein Dep. at 42).

However, if Blue Cross did have a letter from a renal specialist stating that Mr. Pannone was fully employable, then this information should have been taken into consideration. We find a genuine issue of material fact in this regard. *See Rizzo*, 84 F.3d at 764.

**16.** Mrs. Pannone testified that it was in December, although curiously the EEOC gives the dates of November 6th to the 16th in the Joint Memorandum of Undisputed Facts submitted by both sides. If we were to rely upon those dates, Blue Cross could not have had Dr. McConnell's report because Mr. Pannone's first visit to Dr. McCon-

nell was on November 18th, a date that is not in dispute.

**17.** Interestingly, no one has indicated whether Dr. McConnell was asked to open this computer file or to download it to determine its contents. It seems that would be a fairly simple request.

### C. *Plaintiff's Ultimate Burden*

 We also find genuine issues of material fact as to whether the EEOC can carry its ultimate burden of proving that Mr. Pannone was medically qualified to perform the essential functions of the job in question. *See Teahan,* 951 F.2d at 515; *Rizzo,* 84 F.3d at 763; *LaChance,* 146 F.3d at 836. Dr. Finkelstein, the expert for Blue Cross, testified that his review of the medical records indicated that Mr. Pannone had significant kidney dysfunction in association with hypertension. He further testified that whether an individual with polycystic kidney disease could work was an individual assessment for each person. One has to look at the "complete picture ... everything ... the aneurysms, the cardiac status, the blood pressure control, their physical ability, everything." (Finkelstein Dep. at 39–40). "[Y]ou need to get a complete evaluation of the patient before you can say he's okay to do [the job]." *Id.* at 41. Moreover, Dr. McConnell testified that in his opinion Mr. Pannone could perform the functions of a dishwasher, although he did not have the precise job description before him and did not consider some of the job duties such as carrying out the trash, washing the floors, walls, and tables. Even Dr. Liben has indicated that Mr. Pannone's diagnosis of polycystic kidney disease was of positive significance and was something he would have taken in to consideration had he been aware of the diagnosis. We do know that Mr. Pannone continued to work at Roy Rogers for a short period of time, but we do not know how similar those job requirements were to those of the Blue Cross Dishwasher I position. Additionally, the record indicates that eventually Mr. Pannone experienced total kidney failure and had to be placed on dialysis.

Thus, we find genuine issues of material fact as to whether the EEOC can carry its ultimate burden of proving that Mr. Pannone was in fact qualified for the position of Dishwasher I at Blue Cross. Therefore, we deny the motions for summary judgment on this ground. *See McNeal v. Maritank Philadelphia, Inc.,* No. Civ. A. 97–0890, 1998 WL 404023, at *8 (E.D.Pa. July 1, 1998) (denying summary judgment to an employer in an ADA case on plaintiff's failure to hire claim based upon the results of a pre-employment physical).

### CONCLUSION

Accordingly, the Motion for Partial Summary Judgment of the EEOC [Doc. # 22] is DENIED. Likewise, the Cross–Motion for Summary Judgment of Blue Cross Blue Shield of Connecticut [Doc. # 26] is DENIED.